Joseph **AMDUR**, Plaintiff,

v.

**ZIM ISRAEL NAVIGATION COMPANY,** Ltd., Defendant.

**No. 64 Civ. 1919.**

United States District Court, S. D. New York.

May 29, 1969.

Bernstein, Seawell, Kaplan & Block, New York City, for plaintiff, Frederick H. Block, Fred A. Bodoff, New York City, of counsel.

Hill, Betts, Yamaoka, Freehill & Longcope, New York City, for defendant, Thomas H. Healey, New York City, of counsel.

LEVET, District Judge.

Plaintiff, Joseph Amdur, from Mt. Vernon, New York, brings this action against the defendant, Zim Israel Navigation Company, Ltd. ("Zim") for inju-

ries he allegedly suffered by reason of the alleged malpractice of a ship's physician, Dr. Yaulus, while plaintiff was a passenger on the SS Zion, owned by Zim, on a voyage from Haifa, Israel, to New York.

The sole basis of plaintiff's claim in this action is that Dr. Yaulus incorrectly diagnosed plaintiff's ailment and failed to treat properly or recommend proper treatment for plaintiff. There was no claim of any affirmative acts of malpractice. (See pretrial order)

The action was tried to the court without a jury.

After hearing the testimony of the parties, examining the exhibits, the pleadings and the Proposed Findings of Fact and Conclusions of Law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

### A. LIABILITY QUESTION

1. Plaintiff, age 51 in 1961, a cantor-minister at a congregation in Mt. Vernon, New York, experienced two episodes of chest pain on April 21, 1961 and April 22, 1961. The first attack lasted six or seven minutes, and the second lasted upwards of 40 minutes, as a result of which plaintiff was hospitalized from April 22, 1961 until May 4, 1961, when he was discharged with a diagnosis of coronary insufficiency. Electrocardiograms taken at the hospital at that time, and an electrocardiogram taken by Dr. Teitelbaum, a Mt. Vernon physician, in June 1961, confirmed cardiac abnormalities. (13)[1]

2. In June 1961, Dr. Teitelbaum gave plaintiff permission to travel to Israel, but at that time instructed plaintiff (a) to consult a doctor at once if he had chest pain or chest discomfort and to show such doctor the electrocardiogram of plaintiff which Dr. Teitelbaum had taken in June 1961; and (b) to have his blood pressure checked from time to time.

3. On June 29, 1961, plaintiff, his wife and children reached Israel by air and toured the country until August 13, 1961. On August 3, 1961, while at Elath, an area in Southern Israel, in extremely hot weather, plaintiff apparently experienced a spell of chest pain. The following facts appear in this connection:

(1) The Gibraltar Hospital record, in plaintiff's history, refers to chest pain during the Elath incident (Ex. 4), although plaintiff denies reporting this fact (149);

(2) Although plaintiff denied experiencing any chest discomfort (104), he testified that the shortness of breath at Elath lasted 15 or 20 minutes (148, 106) and that he felt weak all over (107, 108) on August 3, 1961;

(3) Plaintiff's wife testified that plaintiff had discomfort, went out on the balcony and stayed "several hours," came back to the room, found it stuffy and went out again (201, 202);

(4) Dr. Teitelbaum testified that he received a note in connection with trial preparation which read: "In Elath, in August, experienced pressure pains in chest." (364, 365)

4. After the Elath episode, plaintiff consulted his cousin, a physician at Natania Hospital in Israel, told him about the episode, showed him his cardiogram (of June 1961), and asked the physician to take his blood pressure. (109) In spite of these facts, Dr. Burstein, plaintiff's expert witness, concluded that "the attack at Elath doesn't indicate a heart attack."

5. The plaintiff bought passenger tickets from the defendant at Jerusalem on July 16, 1961 (see Ex. 2); and on August 13, 1961 boarded the defendant's vessel, the SS Zion, at the Port of Haifa, Israel, as a passenger bound for New York. There is no evidence that plain-

---

1. Unless otherwise identified, numbers in parenthesis refer to pages in the trial transcript.

tiff gave defendant any notice of his physical condition or made any request for special care.

6. The SS Zion was owned, operated and controlled by defendant and carried 385 passengers. A physician and nurse were aboard as required by Israeli law. (178)

7. On Tuesday evening, August 15, 1961, while the vessel was at sea en route from Haifa to Naples, the plaintiff experienced a chest pain which lasted approximately five to seven minutes (118) when he was about to retire. (24) He said that this attack was generally similar to that which he had experienced in April 1961. He did not seek a doctor at this time. (25, 118)

8. Having taken no medicine (122), the next morning, Wednesday, August 16, 1961, while the ship was docked at Naples, plaintiff went to the office of the ship's doctor, Dr. Yaulus. (118, 119) Dr. Yaulus "took his pulse," (120) stethoscoped him, and took his blood pressure. Plaintiff said he told the doctor of his April 1961 experience, the hospitalization in Mt. Vernon, and "of the pain," "which reoccurred the night before," and showed him the June electrocardiogram. (25, 26) Plaintiff did not tell Dr. Yaulus that he had experienced chest pains or shortness of breath in Elath (on August 3, 1961), before boarding the SS Zion (143, 161); and there is no evidence that plaintiff told Dr. Yaulus that on April 22, 1961, at Mt. Vernon, his pains continued for a period of 40 minutes, as he had told Dr. Teitelbaum. (25, 30, 348) Plaintiff testified that the doctor said: "There is nothing wrong with you, you just overate." (26) Plaintiff said he asked the doctor about going ashore and the doctor answered: "Go ahead, you are in perfect shape." (29) Between 8:00 and 4:00 that day, plaintiff rested, relaxed and slept (121), and spoke to his wife, who told him not to go ashore. (122)

The electrocardiogram taken in June 1961 was never produced at the trial, although Dr. Teitelbaum testified he gave it to plaintiff to take with him to the Mid-East. (350) Dr. Teitelbaum stated he did not know where the records were or even if the June record varied from the normal (353), or what they showed. (350) Plaintiff said that now he neither had the electrocardiogram nor knew what he did with it. (351) Thus, there is no proof as to what the electrocardiogram, which plaintiff said he showed to Dr. Yaulus on August 16, 1961, actually did show.

■ Under the foregoing circumstances, I find that there was no malpractice by Dr. Yaulus as to plaintiff on Wednesday, August 16, 1961, since plaintiff failed to acquaint Dr. Yaulus with the full history of his ailment sufficient to enable the physician adequately to treat him.

9. On Wednesday, August 16, 1961, at about 4:00 P.M., plaintiff and his wife went ashore at Naples, descending 100 steps at the end of the dock (122, 123), walked the streets around the pier, went "window shopping" for about two hours, and, returning, ascended the 100 steps early in the evening. (123, 124) While ashore, plaintiff sought no medical assistance or medicine. (124) Neither did he go to the ship's doctor that day before the ship sailed. (125) Apparently, plaintiff suffered no ill effects from climbing the steps such as Dr. Guck opined, which indicated that plaintiff's exercise tolerance was good. (561)

Dr. Burstein stated that it would be good practice for a general practitioner to advise a person who has suffered from coronary insufficiency not to climb long stairways. (406, 407)

Dr. Guck, when asked his opinion as to plaintiff's traveling up the "one hundred steps," indicated that it was ill-advised for a patient, who had been told he had an angina or coronary insufficiency, to pursue activities which might very well cause him further symptoms. (546, 547)

This court may add that the plaintiff, as an educated person, should have known that such exertion was improper. Dr. Guck distinctly indicated that it was

ill-advised for the plaintiff, who was aware of previous coronary insufficiency and recognized his pains on ship as similar, to pursue activities which might well cause further symptoms. (546, 547) The plaintiff, before this trip ashore, was advised by his wife not to go ashore, but went nevertheless. (121, 122)

10. On Thursday, August 17, 1961, while in bed, at about 10:00–10:30 P.M., chest pains of plaintiff recurred, whereupon plaintiff rang for the steward and asked to see the doctor. (35) The nurse came and administered two pills to the plaintiff, but the pain did not subside; the nurse brought two more pills, the pain still did not stop, and the nurse again returned to give plaintiff a "hypo." Although plaintiff asked the nurse to get the doctor, she said: "This [apparently the hypo] is what the doctor prescribed." (37) About 3:30 A.M. (August 18th) plaintiff fell asleep. (36) Dr. Burstein testified that the record indicated that plaintiff had suffered an attack of myocardial infarction at that time (399), but there is no proof that Dr. Yaulus knew or should have known this fact from any information then brought to his attention, directly or indirectly.

On Friday morning, August 18, 1961, when Mrs. Amdur believed that her husband had a fever (225), the nurse took plaintiff's temperature and then said: "It is not much, it isn't really fever." (226) That morning the nurse told plaintiff that the doctor was busy with another patient, and, later, that the doctor was busy ashore getting a doctor for another patient. (276, 277)

On Friday afternoon, August 18th, at about 4:00 or 4:30, when Mrs. Amdur asked the doctor to come and see her husband (218), according to Mrs. Amdur the doctor said: "What may seem irregular to you, may be regular to me. However, I will be there shortly."

At this time, although the plaintiff told the nurse "about the pain" in his chest and asked for the doctor, there is no indication whatsoever that he told her any more than that. Presumably, that was all the nurse told the doctor, whereupon the doctor prescribed the pills and the hypo. And as Dr. Guck stated, there was no negligence under these circumstances. (See Discussion)

11. On Friday, August 18, 1961, at about 9:30 A.M., while the vessel was docked at Marseilles for the day, the doctor told plaintiff's wife that he was too busy to see plaintiff at that time (215–217), but visited the plaintiff at about 4:30 P.M. that day. After examining plaintiff, Dr. Yaulus told plaintiff's wife that he did not think plaintiff's condition had anything to do with his prior coronary, that it was too late to get the doctor from Marseilles, that the plaintiff should rest, and that he would be all right. (218–219, 231–233) Later that day the doctor told plaintiff's wife that he would radio to Gibraltar, the next port of call, and have an ECG taken of plaintiff. Because of vibrations, it was impossible to operate an electrocardiograph aboard the ship. The day following, Saturday, August 19, 1961, the doctor told plaintiff's wife that the plaintiff would be taken to the hospital at Gibraltar for an ECG. (234–236)

As hereinafter stated, the plaintiff has not shown by a fair preponderance of the credible evidence that Dr. Yaulus was guilty of malpractice. As Dr. Guck testified, the medication given by Dr. Yaulus on Thursday evening and early Friday morning showed good judgment *under the circumstances.* (586, and Discussion) Although Dr. Guck conceded that on Friday at 4:30 P.M., when plaintiff's wife requested Dr. Yaulus to summon a doctor from Marseilles, Dr. Yaulus should have done so, Dr. Guck conceded that Dr. Yaulus in no way contributed to the intensification of plaintiff's cardiac problem. (580, and Discussion)

For the reasons expressed hereafter in my Discussion, I am not convinced by the testimony of Dr. Burstein.

12. On arrival at Gibraltar, Sunday, August 20, 1961, after examination of plaintiff by a Dr. Isola, the port doctor, the ship's doctor directed plaintiff to proceed to the hospital in Gibraltar for an electrocardiogram. (39) Plaintiff proceeded to a taxi at the pier and rode to the hospital. (40–41)

13. Plaintiff has failed to prove by a fair preponderance of the credible testimony that defendant's ship's doctor was guilty of medical malpractice. (See Discussion, which is hereby incorporated)

14. The plaintiff has failed to prove by a fair preponderance of the credible evidence any proximate causal relationship between his treatment on the SS Zion by the ship's doctor and the alleged resulting injury.

■ 15. I find that the law of Israel governs the disposition of all tort and contract claims in this action. I further find that the statutory standard in Israel as to negligence is as follows:

Negligence consists of "(i) doing some act which in the circumstances a reasonable prudent person would not do or failing to do some act which in the circumstances such a person would do or (ii) failing to use such skill or to take such care in the exercise of a profession, trade or occupation as a reasonable prudent person qualified to exercise such profession, trade or occupation would in the circumstances use or take." (Civil Wrongs Ordinance of the State of Israel, § 50(3) )

The opinion of the Supreme Court of Israel in Lewithal v. Kupat Holim (Piskei-Din shel Beit-Hamishpat Hael'yon l'Israel, Vol. 22, Part 2, No. 8/Year 5728/9–1968) dealt with the general obligation of a physician. The opinion states:

"* * * what is the degree of care demanded of physician, and in what case will he be considered guilty of negligence? It had been repeatedly said in connection with these matters that a person is responsible only if there had been negligence, but is not responsible for every error, and his liability is not an absolute one or like that of an insurance company insuring against any accident. * * *

"Indeed, generally when the question of negligence arises, it is: how would a reasonable man behave, and in the case of negligence imputed to a physician—how would a reasonable doctor act * * *.

"With regard to such attitude, of taking into consideration the interest of the community (public good), it can be said, of course, that Civil Wrongs Ordinance makes no allusion to it, but this matter at all events serves as a warning to us not to impose on physician duty of care that exceeds what is customary in this profession * * *." (pp. 5–6 of English translation)

This opinion involved operational procedures in a surgery but the statements above quoted relate to the general obligations of a physician as stated by the Israeli Court.

■ 16. Adopting the standard above set forth, I am forced to find that plaintiff has failed to show by a fair preponderance of the credible evidence that Dr. Yaulus was negligent as to plaintiff.

■ 17. I find that the law of Israel, as of 1961, does not support plaintiff's contention that Zim is vicariously liable for any alleged malpractice of Dr. Yaulus as claimed by plaintiff. (See Discussion)

■ 18. I find that under the law of Israel as of 1961, Israel followed the doctrine of comparative negligence. (See Discussion)

## DISCUSSION

### ISRAELI LAW

### I. APPLICABLE LAW

■■ Since the tort in this case is alleged to have occurred aboard an Israeli vessel on the high seas, the action is governed by federal maritime law, including the federal conflict of laws rules. Siegelman v. Cunard White Star,

221 F.2d 189 (2nd Cir. 1955). Under the general maritime rule that the law of the flag governs, see Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), and Sonnesen v. Panama Transport Co., 298 N.Y. 262, 82 N. E.2d 569 (1948), motion for reargument denied 298 N.Y. 856, 84 N.E.2d 324, cert. denied 337 U.S. 919, 69 S.Ct. 1157, 93 L.Ed. 1729 (1949), motion to extend time to file petition for rehearing denied 337 U.S. 961, 69 S.Ct. 1530, 93 L.Ed. 1760 (1949), the present action must be determined, if possible, by Israeli law. Wendell v. Holland-America Line, 30 F. R.D. 162 (S.D.N.Y.1961).

▬▬▬ The general federal rule is that the law of a foreign county is a fact which must be proved. F.R.Civ.P., Rule 43(a). However, this court, sitting in the Southern District of New York, may apply the standards of judicial notice contained in the New York Civil Practice Law and Rules, Rule 4511. Though this rule authorizes a New York court, in its discretion, to take judicial notice of the law of a foreign country, a court abuses its discretion in taking judicial notice of foreign law unless the party who would otherwise have the burden of proving the law in some way adequately assists the court in judicially learning it. Walton v. Arabian American Oil Company, 233 F.2d 541 (2nd Cir. 1956).

In the present action, plaintiff has endeavored to sustain its burden of proving foreign law by submitting the expert legal testimony of Samuel Cohen, an Israeli attorney, and by submitting to this court several translations of Israeli decisions. In some instances, this court finds the proof of foreign law to have been sufficient to permit a finding of fact; in other instances, however, it has been impossible to determine the precise nature and scope of Israeli law. In any event, detailed findings of fact concerning Israeli law on certain topics have been obviated by the general holding of this opinion that the plaintiff has failed to prove any negligence or malpractice on the part of Dr. Yaulus.

Samuel Cohen, presently a resident of New York City, a member of the bar of the State of New York since 1962, a member of the bar of the State of Israel since 1948, and formerly practicing law in Israel, testified as to the law of Israel. (287–290) He is now employed as the reference librarian at Columbia School of Law. (288)

## II. EXCULPATORY CLAUSES

On the ticket purchased by plaintiff, under the general heading of "Ticket Contract" and the subheading, "Exemptions and Limitations of Carrier's Liabilities," was the following statement:

"(v) The Company does not undertake that a doctor or surgeon shall be carried aboard the Vessel. Any medicines, surgical or medical attendance furnished by the ship's surgeon or doctor if any, officers or employees of the Company or Vessel or by any other surgeon or doctor or other person shall be and are accepted at the passenger's sole risk, and the Company shall not be responsible for the nature or consequences of such medicines, treatment or attendance. Any medical or hospital expenses incurred on shore must be paid for by the passenger."

With respect to this defense which was asserted in defendant's Answer (Par. Seventh), defense counsel stated: "The only reason I direct your attention to that phrase is to show there was no contractual undertaking and agreement between Dr. Amdur and Zim," (6) whereupon plaintiff's counsel said:

" * * * I will concede for the purposes of this case that there was no contractual arrangement between the plaintiff and the ship line with respect to the furnishing of medical services.

" We are relying solely on the alleged malpractice. Because otherwise, your Honor, I would be prepared to prove that that stipulation in the ticket under Israeli law has no force and effect, because it was not contained in a separate document which

was signed by the passengers, and we get into that kind of business." (6)

However, on February 26, 1969, when this court asked defense counsel to state categorically whether he asserted the defense of the above paragraph (v), he said the answer was "Yes." (SM 3, February 26, 1969)

Mr. Cohen testified that exculpatory clauses such as those in Exhibit 2 have been ruled as invalid by the Supreme Court of Israel, citing Zim Shipping Company Ltd. v. Mazier, Civil Appeal 461/62, 17 Piskei Din. Page 1319, 1963. (306, 308, 489, 491) He conceded that there were no prior decisions on this point. (309, 313, 314) However, it appears there that the basis of liability was food poisoning, because of which the passenger affected sued the ship for negligence. (491) Mr. Cohen's opinion was that the Mazier case held that such exculpatory clause was invalid as being against public policy. (494) The exculpatory clause in the Mazier case, Cohen said, was as follows:

" 'The contents of the limitation clause after reading its Hebrew version is that the company and its employees shall not be responsible for any wrong that would occur to the passengers: death, personal injury, or monetary loss. Even if such shall be caused by the act of one of the ship's employees and especially if there is only negligence.' " (503)

"The company declares in this clause that it doesn't give any guarantee or undertaking with regard to the quality, condition or quantity of any food, drink or drug which shall be given to a passenger." (504)

Based upon Mr. Cohen's opinion concerning the applicability of one inapposite precedent to the case at bar, it is impossible for this court to make a finding of fact concerning the operation of the laws of Israel in the field of exculpatory clauses. Since the operation of this clause is an integral part of a contract, this court must give effect to the contract as drawn unless some affirma-

tive proof of invalidity is demonstrated. Plaintiff has failed to demonstrate that the laws of Israel require any particular treatment of exculpatory clauses. However, due to the factual determinations heretofore made, it is unnecessary to determine the precise status of this exculpatory clause.

### III.

### LIABILITY OF SHIP FOR ACTS OF PHYSICIAN

Section 12(1) of the Civil Wrongs Ordinance is as follows:

"For the purposes of this Ordinance a master shall be liable for any act committed by his servant which—

"(a) he has authorised or ratified, or

"(b) was committed by his servant in the course of his employment: Provided that—

"(i) a master shall not be liable for any act committed by any person not being another of his servants, to whom his servant has without his authority, express or implied, delegated his duty; and

"(ii) a person who is compelled by law to use the services of another person, in the choice of whom he has no discretion, is not liable for any act committed by that other in the course of such employment."

Section 2(2) of the Civil Wrongs Ordinance provides in pertinent part:

"In this Ordinance, unless the context otherwise requires—* * * 'master' means a person who, in relation to another, has complete control of the way in which such other performs his work for such person and is not himself subject to any similar authority in respect of the same work, and 'servant' means any person whose work is so controlled."

(Also see testimony of Cohen, 512)

Mr. Cohen's opinion was that, under Israeli law, malpractice by a ship's doctor in treatment of a passenger would, likewise, result in liability of the ship-

owner. (496–500) The basis of his opinion was set forth as follows:

"A shipowner is liable for the malpractice of a ship's doctor under the doctrine of Respondeat Superior; Goyta v. Kupat (Holim) Sick Fund cc869/56, 14 Pesakim, 107; Appeal Dism-Supreme Court-CA 164/57, 12 Piskei Din, 834 (1958); Gerafi v. Kupat (Holim) Sick Fund 11 Pesakim (DC Reports), 336; Max Riger v. Haifa Oil Refineries Ltd, 55 Pesakim (DD Reports), 291 (1967)." (500)

Cohen's testimony as to those cases was as follows: Goyta and Gerafi v. Kupat both involved sick funds (513, 514); Max Riger v. Haifa concerned a salaried physician who worked for Haifa Oil Refineries which was sued by an employee. None involved a ship, its doctor and a passenger. (514)

The opinion in Riger v. Haifa Refineries Ltd., 55 Pesakim 291, C 1967 is not an authority for holding Zim to vicarious liability for the acts of its ship doctor. . There the plaintiff was an employee of defendant under conditions of employment requiring employees to secure certification by defendant's clinic as to causes of days of sickness. Moreover, as the opinion states: "Defendant admits its vicarious responsibility for Dr. Freudenthal in case the latter is found liable." Hence, the issue was medical causality and damages.

The opinion of G'irafi v. Kupat Holim, 11 Psakim 336 (1955), deals with the question of vicarious liability. Kupat Holim (the Sick Fund) sent plaintiff to a Dr. Daniel for X-Rays. It happened that Dr. Daniel's treatment was negligently administered and that plaintiff suffered injuries. The issue was the vicarious liability, if any, of Kupat Holim. In that decision (G'irafi), as the opinion points out, Kupat Holim agreed to perform medical services (p. 33). It sent plaintiff to Dr. Daniel for treatment. It was the contractual duty of Kupat Holim to provide medical treatment for its sick members which could be discharged only by its agents or employees. (p. 34) "* * * the Fund cannot escape the vicarious liability that had obviously rested on its shoulders * * *." (p. 36) Hence, the court stated: "* * * my conclusion is that Kupat Holim is liable to Plaintiff in respect to Dr. Daniel's negligence, since the latter was the agent of Kupat Holim and performed what Kupat Holim had been under a duty to Plaintiff to do." (p. 37)

Although perhaps obiter dictum, the court stated that Kupat Holim was not an "employee" or "master" within the meaning of Section 12 of the Civil Wrongs Ordinance defining "master." (p. 13)

I would expect the Supreme Court of Israel, if such a case as this were submitted, to agree with this expression, even though it was contained in a District Court decision.

In the present action (Amdur), the defendant did not contract to supply medical service. In fact, plaintiff stipulated that there was no contractual arrangement between him and the ship concerning medical services. (6)

Guiatta v. Kupat Holim, 14 Psakim 107 (1957), affd Civ Appeal 164/57, Supreme Court Judgments, 34, p. 230, in its holding is somewhat similar to G'irafi, supra. In Guiatta the District Judge wrote:

"Responsibility for this negligence can be attributed by Plaintiff to Defendant either under the law of civil wrongs (torts) or under the law of obligations (contract). A person who applies for services of Kupat Holim (Sick Fund) is entitled to expect that the physicians of that institution will not treat him negligently. See Charlesworth, 3rd edition, p. 477.

"Dr. Glaser testified that he is Kupat Holim physician employed at its clinic at Beer Yaakov. He is the only doctor there. It is known that Kupat Holim provides services to its members against payment of their dues on certain conditions. It has been proved that Plaintiff was such member and

his membership and dues paid by him gave him the right to be given treatment and hospitalization free of charge insofar as his right eye was concerned. Dr. Glaser was a servant of Defendant." (pp. 17–18)

"* * * the conclusion is reached that Kupat Holim had undertaken to supply Plaintiff with medical treatment by its servants, professionally qualified, and in consequence it is liable in respect of negligent acts of its servants." (p. 19)

It is difficult for this court to see how, under the precedents cited by plaintiff, a shipping company becomes the master of a ship's physician. A sick fund exists specifically to supply medical treatment to members; such treatment is performed by agents or employees of the sick fund. A sick fund, like a hospital, is in the business of curing or treating patients. However, a shipping company is not in the business of providing medical services to passengers; it does not possess the expertise requisite to supervise a physician or surgeon carried on board a ship as a convenience to passengers. A ship is not a floating hospital; a ship's physician is an independent medical expert engaged on the basis of his professional qualifications and carried on board a ship for the convenience of passengers, who are free to contract with him for any medical services they may require.

Since plaintiff has not been able to provide this court with precedent from Israeli law sufficiently in point to require a specific finding of fact, it is necessary for this court to seek guidance from general maritime principles of law recognized by this forum. It is the general rule that a physician or surgeon taken on board in compliance with a statutory command is not a servant or agent of the shipowner and the latter is not liable for the negligence of the former in treating a passenger, provided the duty of selecting a physician who is competent and duly qualified has been fulfilled. In the selection of the physi-

cian, only reasonable care and diligence need be exercised; and this duty is sufficiently fulfilled when the physician's fitness is diligently inquired into and proper evidence of his qualifications received. The fact that the physician errs in his treatment does not prove that he was incompetent or that the company was negligent in appointing him. The Korea Maru, 254 F. 397 (9th Cir. 1918); Churchill v. United Fruit Co., 294 F. 400 (1 Cir., 1923); Branch v. Compagnie Generale Transatlantique, 11 F.Supp. 832 (S.D.N.Y.1935); O'Brien v. Cunard Steamship Co., 154 Mass. 272, 28 N.E. 266; The Great Northern, 251 F. 826 (9th Cir. 1918); Laubheim v. De K. N. S. Co., 107 N.Y. 228, 13 N.E. 781 (1887).

There is an indication in one of the more recent American decisions that a shipping company will be held vicariously liable for the negligence or malpractice of a ship's physician on the theory that such a physician is a salaried member of the crew, subject to the ship's discipline and master's orders, and presumably under the general direction and supervision of the company's chief surgeon. Nietes v. American President Lines, Ltd., 188 F.Supp. 219 (N.D.Cal. 1959). This rationale, while perhaps viable for the specific fact pattern in Nietes, is not sound as a general rule. It is pure sophistry to assert that a ship's master is capable of "supervising" the medical treatment rendered by a physician, or that some shore-based "company chief surgeon," by his very existence, is capable of supervising or controlling the actions of a ship's physician. A shore-bound chief surgeon may indeed be capable of setting forth general medical procedures of engaging the services of competent physicians, and of prescribing the contents of the ship's medical chest; but he does not occupy a position of control over a ship's physician sufficiently immediate to warrant equation with the hospital-doctor standard. To pretend, as the Nietes case does, that mere employment of a physician by a shipping company pursuant ei-

ther to statutory command or to the exigencies of competitive transportation creates control, is. to create a species of liability without fault which is without precedent.

Assuming, however, without deciding, that Israeli law might evidence a similar trend in decision toward Nietes, it is unnecessary for me to dispose of this matter formally, since my factual determinations indicating lack of negligence or malpractice obviate any application of the respondeat superior doctrine.

## IV.

## THE SAFETY OF SHIPPING ORDINANCE

Cohen said he was familiar with "the safety of shipping law" or "ordinance," Section 2(6), which states:

"A: Where there are on board 50 to 200 passengers or where those on board number over 100 persons, including the crew, one doctor is required.

"B: Where there are on board 200 to 1,000 passengers, one doctor and one nurse." (509)

Cohen said this ordinance was binding on shipping companies. (511)

The SS Zion carried 385 passengers (178) and consequently would be required to have one doctor and one nurse.

However, this ordinance in no way affects my determination in this case. (See discussion of law under III)

## V.

## COMPARATIVE NEGLIGENCE

Mr. Cohen stated that in 1961 Israel followed the doctrine of comparative negligence. This, he said, was based on Section 55(c), which in part is as follows:

"(1) Where any person suffers damage as a result partly of his own fault and partly of the fault of any other person or persons, a claim for compensation in respect of that damage shall not be defeated by reason of the fault of the person suffering the damage but the compensation recoverable in respect thereof shall be reduced to such extent as the Court thinks just and equitable having regard to the claimant's share in the responsibility for the damage * * *." (495–496)

Subsection (2) is as follows:

"(2) Where compensation is recoverable by any person by virtue of subsection (1) subject to such reduction as is therein mentioned, the court shall find and record the total compensation which would have been recoverable if the claimant had not been at fault."

(See Civil Wrongs Ordinance.) In this connection, Cohen conceded that under some circumstances the plaintiff could be barred completely from recovery. (506, 507) He here referred to Section 12(1). (507)

Since I have determined that defendant was not negligent and that defendant's acts, even if it is responsible for the ship's doctor's acts, were not shown to be the cause of any injury to plaintiff, it is unnecessary to consider the comparative negligence doctrine.

## TESTIMONY OF THE PHYSICIANS

## DR. TEITELBAUM

The net result of Dr. Teitelbaum's testimony was that the electrocardiogram in November 1961 revealed a coronary thrombosis, where the April 1961 record showed only coronary insufficiency. Obviously, this does not prove plaintiff's claim against defendant. (322–325, 326–337)

Dr. Teitelbaum, plaintiff's own physician, a general practitioner at Mt. Vernon, had not warned plaintiff about stairs (124) and yet plaintiff claims Dr. Yaulus, who had much less information than that available to Dr. Teitelbaum, was incompetent.

Dr. Teitelbaum admitted that when a person has had coronary insufficiency,

there is a tendency for coronary thrombosis. (357)

## DR. JULIUS BURSTEIN

Dr. Julius Burstein, a specialist in cardiovascular diseases, who testified for plaintiff (371), after a long hypothetical question of 24 pages posed by plaintiff's counsel (373–397) (and in full accordance with plaintiff's contentions), stated that, in his opinion, "the ship's doctor did not use the ordinary measures which any general practitioner should use with a patient with the symptoms that plaintiff had." (397) Dr. Burstein's opinion was that the advice given by the ship's doctor was a competent producing cause of the damage which the plaintiff sustained. (403)

Dr. Burstein in his direct testimony stated the reasons for his opinion as follows:

(1) The patient informed the ship's doctor of his previous coronary insufficiency, etc.;

(2) The attack at Elath did not indicate a heart attack;

(3) The ship's doctor should not have allowed plaintiff to go ashore in Naples;

(4) The plaintiff, after pain lasting several hours, should have been taken off the ship at Marseilles and put in a hospital. (398–399)

However, when Dr. Burstein amplified his reasons for the foregoing opinions, he limited the opinions he had expressed so that in fact no reasonable medical certainty for his conclusions was set forth. This is fully revealed by the following statements:

(1) Dr. Burstein said that a man with an acute myocardial infarction, if given rest and supportive measures, has less chance of damaging his heart muscles than if he goes a few days beyond that point (405);

(2) However, when asked what the effect would have been if hospitalized in Naples on Wednesday morning, as to the acute infarction, he answered: "We can never say with any degree of absolute specificity that an acute myocardial infarction would or would not happen anyways." (405, 406)

(3) Dr. Burstein also said: "We can't say with any exactness, but he would certainly have been much more likely not to have an attack of acute myocardial infarction if he had been hospitalized in Naples" but he could not say with certainty that it would have forestalled anything. (406)

Dr. Burstein further stated:

(4) That it was a common occurrence for general practitioners to mistake pain in the chest for overeating (409);

(5) That he (in his answer to the hypothetical question) had assumed that Dr. Yaulus knew at Marseilles about plaintiff's prior history (410)—that he got a definite statement in Marseilles—a history of chest pain. Yet the only history that Dr. Yaulus got when the ship was near Naples was that Mr. Amdur said: "The night before I had some pain in my chest." (411)

(6) Dr. Burstein could not be certain that anything done or not done before arrival at Marseilles would be considered inadequate. (412)

(7) Dr. Burstein could not say that when the ship was in Naples, when Dr. Yaulus told plaintiff that his pain was probably due to indigestion, Dr. Yaulus was guilty of medical malpractice. (413–416)

(8) Dr. Burstein admitted that if he had been told that an attack lasted for more than 40 minutes he would become more assured that it was coronary thrombosis. (418)

(9) Dr. Burstein conceded that his opinion was based upon partial facts. (449, 450, 451)

Furthermore, even if Dr. Burstein's testimony is assumed to indicate malpractice, and it is assumed that proximate cause was demonstrated, he conceded that he could not evaluate the exact amount of damage done. (423–424)

Consequently, I am forced to conclude that Dr. Burstein's testimony is uncon-

vincing, inconclusive, and insufficient to demonstrate liability.

### DR. GUCK

On the other hand, the testimony of Dr. John K. Guck, a specialist in internal medicine and in cardiovascular diseases, who was called by defendant, demonstrates the inadequacy of plaintiff's claims of malpractice by Dr. Yaulus.

Dr. Guck examined plaintiff in August 1965, noted his blood pressure, his weight (168 pounds—a little overweight), age (56), used a stethoscope and took both an electrocardiogram and an X-Ray. (581–582) His diagnosis then was: "Arteriosclerotic heart disease, with coronary sclerosis, myocardial fibrosis, an old myocardial infarction, normal sinus rhythm, New York Heart Classification 2B." (527) "Type 2 is definite organic heart disease with minimal to virtually no symptoms at the time." (528) Dr. Guck said that arteriosclerotic heart disease is a characteristic of every acute myocardial infarction. (583)

When counsel for defendant propounded a hypothetical question on assumptions based on defendant's factual claims (531–535), Dr. Guck said that in his opinion the (ship's) "doctor discharged his duties in a fashion which would be expected of the average doctor under the circumstances, being on board a ship, with somewhat limited facilities, and with the knowledge he had and the findings from that physical examination" [that of Wednesday morning (p. 531)]. (535)

The reasons Dr. Guck gave for this opinion were as follows:

(1) A digestive problem may manifest itself with chest discomfort.

(2) The time duration of the discomfort, related as 5 to 6 minutes, was relatively short.

(3) The ship's doctor concluded that the cause was dietary indiscretion, that the patient was suffering digestive symptoms, and that this was reinforced by the quality of the pulse, appearance of the patient and blood pressure. (536)

When asked to assume a recitation of coronary insufficiency, Dr. Guck said that this would not change his opinion for the following reasons:

(1) A patient diagnosed as having coronary insufficiency is also, like anybody else, subject to indigestion, gall bladder disease, arthritis and other ailments;

(2) It is difficult to diagnose chest pain due to coronary insufficiency, and in many instances, electrocardiographs and hospital material are necessary. (537)

When defense counsel posed another hypothetical question (538–543), apparently based on plaintiff's contentions, Dr. Guck again stated that the doctor exercised reasonable skill and judgment under the circumstances. (543) He gave the following reasons for this conclusion: The doctor gave the patient bed rest in his cabin, maintained supervision, suggested a consultation he arranged at Gibraltar, the next port of call, and then at Gibraltar arranged for care of the patient (at the hospital). (544)

Another hypothetical question referred to (1) the episodes in April 1961 at Mt. Vernon, (2) the episode at Elath (August 3rd), (3) an attack toward the end of July 1961, (4) the episodes on the ship on Monday, Wednesday and Thursday (August 14th, 16th and 17th). (544, 545) When asked about the significance of the foregoing (545), Dr. Guck stated that this indicated "arteriosclerotic heart disease," "hardening of the arteries," progressive at a variable rate—an impending coronary occlusion or impending heart attack. (546)

Plaintiff's counsel, on cross-examination, propounded another hypothetical question further incorporating plaintiff's factual claims, but Dr. Guck adhered to his previous conclusion, that the doctor used reasonably good judgment under the circumstances. (555) Dr. Guck said also that the fact that the

ship was docked at Naples all that day would not lead him to change his answer. (556) Dr. Guck repeatedly answered that the doctor exercised such skill in his professional acts as a reasonably prudent and qualified doctor would in these circumstances. (559, 560, 561)

Dr. Guck conceded that the doctor should have seen the patient himself on Thursday evening (563), although he thought the medication given should good judgment on the part of the doctor. (563) However, even if the doctor had seen the patient at 12:30 on the morning of Friday, Dr. Guck said there were no preventative measures which he could have taken (568), although it would have been prudent to try to attempt hospitalization. (570)

Dr. Guck conceded that on Friday at 4:30 P.M., when plaintiff's wife requested Dr. Yaulus to summon a doctor from Marseilles, Dr. Yaulus should have done so, but he said he could give no opinion as to whether the doctor used good judgment in allowing plaintiff to remain on board the vessel knowing it would be on the high seas for two days until they got to Gibraltar. (572, 573) Yet, when Dr. Guck was asked whether the actions of the ship's doctor, as assumed in those questions by plaintiff's counsel, intensified the heart damage, he said his opinion was "that the doctor in no way contributed to the intensification of his cardiac problem." (580) Consequently, the net result of the medical testimony is that plaintiff has failed to prove his case of malpractice or negligence by a fair preponderance of the credible testimony.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties and the claims pursuant to 28 U.S.C. § 1332.

2. Plaintiff has failed to prove by a fair preponderance of the credible evidence that the defendant's ship's physician was guilty of medical malpractice.

3. Plaintiff has failed to prove by a fair preponderance of the credible evidence that the defendant's ship's physician was guilty of negligence.

4. Defendant is entitled to judgment dismissing the complaint on the merits, with costs and disbursements.

Settle judgment on notice.