[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-13067
_____

D.C. Docket No. 1:13-cv-20090-JAL

PATRICIA FRANZA,
as Personal Representative of the Estate of
Pasquale F. Vaglio,

Plaintiff - Appellant,

versus

ROYAL CARIBBEAN CRUISES, LTD.,
a Liberian corporation,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(November 10, 2014)

Before MARCUS and ANDERSON, Circuit Judges, and GOLDBERG,[*] Judge.

_____

[*]  Honorable Richard W. Goldberg, United States Court of International Trade Judge, sitting by designation.

MARCUS, Circuit Judge:

In this maritime negligence dispute, an elderly cruise ship passenger fell and bashed his head while the vessel, the "Explorer of the Seas," was docked at port in Bermuda. The injured traveler, Pasquale Vaglio, was wheeled back onto the ship, where he sought treatment from the onboard medical staff in the ship's designated medical center. Over the next few hours, Vaglio allegedly received such negligent medical attention that his life could not be saved. In particular, the ship's nurse purportedly failed to assess his cranial trauma, neglected to conduct any diagnostic scans, and released him with no treatment to speak of. The onboard doctor, for his part, failed even to meet with Vaglio for nearly four hours. Tragically, Vaglio died about a week later. Now, Vaglio's daughter, appellant Patricia Franza, seeks to hold the cruise line, Royal Caribbean Cruises, Ltd. ("Royal Caribbean"), vicariously liable for the purported negligence of two of its employees, the ship's doctor and its nurse, under one of two theories: actual agency (also termed respondeat superior) or apparent agency.

Franza commenced this suit against Royal Caribbean in the United States District Court for the Southern District of Florida under 28 U.S.C. § 1333 and the general maritime law, but the district court dismissed her complaint in its entirety. First, in disposing of Franza's actual agency claim, the trial court applied a longstanding rule set forth most prominently in Barbetta v. S/S Bermuda Star, 848

2

F.2d 1364 (5th Cir. 1988). Although the general maritime law of the United States has long embraced the principles of agency law, the so-called "Barbetta rule" immunizes a shipowner from respondeat superior liability whenever a ship's employees render negligent medical care to its passengers. The rule confers this broad immunity no matter how clear the shipowner's control over its medical staff or how egregious the claimed acts of negligence. Separately, the trial court dismissed Franza's apparent agency claim as inadequately pled.

On appeal, Franza raises two questions of first impression. No binding precedent in this Court or in its predecessor, the former Fifth Circuit Court of Appeals, decided whether a passenger might invoke the principles of actual agency, or those of apparent agency, to impute to a cruise line liability for the medical negligence of its onboard nurse and doctor. After thorough review, we hold that both theories are available in this case. We have repeatedly emphasized that vicarious liability raises fact-bound questions, and we can discern no sound reason in law to carve out a special exemption for all acts of onboard medical negligence. Much has changed in the quarter-century since Barbetta. As we see it, the evolution of legal norms, the rise of a complex cruise industry, and the progression of modern technology have erased whatever utility the Barbetta rule once may have had. We thus decline to adopt the Barbetta rule, and find that the complaint in this case plausibly establishes a claim against Royal Caribbean under

3

the doctrine of actual agency, as well as a claim under the principles of apparent agency. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

## I.

When we review a dismissal granted under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, we accept the well-pled allegations in the complaint and construe them in the light most favorable to the plaintiff. Chaparro v. Carnival Corp., 693 F.3d 1333, 1335 (11th Cir. 2012) (per curiam). Viewed through this lens, the facts as pled and the procedural history are straightforward.

On July 23, 2011, Pasquale Vaglio was a passenger aboard the "Explorer of the Seas," a cruise ship owned and operated by Royal Caribbean. Compl. ¶¶ 9; 8. Together with his wife and family, id. ¶¶ 11, 13, Vaglio traveled with Royal Caribbean to a port-of-call in Bermuda. After the ship docked in Bermuda early in the morning, Vaglio fell while boarding a trolley "at or near the dock" and suffered a severe blow to the head. Id. ¶ 10. Although Vaglio "could have easily been referred ashore for . . . examination, evaluation and treatment," id. ¶ 44, he was instead "taken in a wheelchair to the ship's infirmary," id. ¶ 11. In fact, notwithstanding other treatment options, Vaglio allegedly "was required to go to the ship's medical center to be seen for his injuries." Id. ¶ 35 (emphasis added).

Vaglio first entered the ship's infirmary at about 10:00 a.m. Id. ¶ 11. No physician examined him at that time; rather, Racquel Y. Garcia, a nurse allegedly employed full-time by Royal Caribbean, performed the first relevant medical evaluation. Id. Nurse Garcia knew about the trolley accident, and indeed she observed a lump and an abrasion on Vaglio's head. Id. Nevertheless, without administering or even recommending any diagnostic scans, Nurse Garcia advised Vaglio and his wife that Vaglio "was fine to return to his cabin." Id. ¶ 11. Cautioning only "that [Vaglio] might have a concussion," the nurse instructed Vaglio's wife to keep an eye on her husband's condition. Id. Vaglio received no "further care or treatment" during this first visit to the ship's infirmary. Id. Instead, "relying on the advice of the ship's medical personnel," the Vaglios returned to their cabin at around 10:45 a.m. Id. ¶ 12.

Ninety minutes later, at about 12:15 p.m., Vaglio's son and daughter-in-law "noted a deterioration in [Vaglio's] status." Id. ¶ 13. Concerned, his daughter-in-law called 911, but it took approximately twenty minutes for "someone [to] arrive[ ] with a wheelchair to transport Mr. Vaglio to the infirmary." Id. According to the complaint, Vaglio then encountered another delay: the onboard medical staff would not examine Vaglio until the ship's personnel obtained credit card information. Id. ¶ 14.

At about 1:45 p.m., nearly four hours after his first visit to the ship's infirmary, Vaglio was finally evaluated by the "ship's physician," Dr. Rogelio Gonzales.  Id. ¶¶ 7, 15.  Like Nurse Garcia, Dr. Gonzales was allegedly an employee of Royal Caribbean.  Id. ¶ 7.  During his examination, Dr. Gonzales started a Mannitol drip and ordered that Vaglio be transferred to King Edward Memorial Hospital in Bermuda "for further care and treatment."  Id. ¶ 15.  Vaglio arrived at the Bermudian hospital at approximately 4:22 p.m., about two-and-a-half hours after his only meeting with Dr. Gonzales, and more than six hours after he was first examined by Nurse Garcia.  Id. ¶ 16.  By that time, Vaglio's life was beyond saving.  Id.  On July 24, 2011, the day after his deadly fall, Vaglio was airlifted to Winthrop-University Hospital in Mineola, New York.  Id. ¶ 17.  There he remained in intensive care until he died one week later.

On January 10, 2013, Patricia Franza, Vaglio's daughter and the personal representative of his estate, initiated this suit under 28 U.S.C. § 1333 and the general maritime laws of the United States.[1]  Notably, Franza did not attempt to sue any of the relevant medical personnel directly.  Instead, she filed a three-count complaint solely against Royal Caribbean, and she continues to press two of her

---

[1] In relevant part, 28 U.S.C. § 1333 provides: "The district courts shall have original jurisdiction, exclusive of the courts of the States, of . . . [a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."

6

three claims on appeal.[2]  Both remaining counts charge Royal Caribbean with the negligence of its onboard medical personnel, and both counts arise from the same nine categories of allegedly negligent conduct: (1) "failing to properly assess [Vaglio's] condition"; (2) "allowing a nurse to make the initial assessment"; (3) "failing to have a doctor assess [Vaglio]"; (4) "failing to timely diagnose and appropriately treat [Vaglio]"; (5) "failing to order appropriate diagnostic scans to further assess the degree of injury"; (6) "failing to obtain consultations with appropriate specialists"; (7) "failing to properly monitor [Vaglio]"; (8) "failing to evacuate [Vaglio] from the vessel for further care in a timely manner"; and (9) "deviating from the standard of care for patients in Mr. Vaglio's circumstances who had suffered a significant blow to the head."  Id. ¶ 20.

Franza ascribed this misconduct to Royal Caribbean in two ways.  First, Franza invoked the doctrine of actual agency, alleging that Royal Caribbean was negligent "by and through the acts of its employees or agents."  Id.  In the alternative, she argued that Royal Caribbean was liable "under the theory of apparent agency," id. ¶ 40, because the cruise line purportedly "manifested to [Vaglio] . . . that its medical staff . . . were acting as its employees and/or actual agents," id. ¶ 28, and Vaglio, in turn, "relied to his detriment on his belief that the

---

[2] Franza's complaint contained one count of "negligent hiring, retention[,] and training by [Royal Caribbean]."  Compl. ¶¶ 41-46.  On appeal, however, Franza has specifically abandoned that claim.

7

physician and nurse were direct employees or actual agents of [Royal Caribbean]." Id. ¶ 38.

On May 30, 2013, the district court granted Royal Caribbean's motion to dismiss. Franza v. Royal Caribbean Cruises, Ltd., 948 F. Supp 2d 1327 (S.D. Fla. 2013). The trial court addressed Franza's actual agency claim separately from the one based on apparent agency. The court dismissed the actual agency count as a matter of law and with prejudice. Specifically, the district court applied the Barbetta rule to conclude that Franza's actual agency claim was "predicated on duties of care which are not recognized under maritime law." Id. at 1331. Next, although acknowledging that some courts had applied the doctrine of apparent agency in similar cases, the district court dismissed Franza's apparent agency claim as inadequately pled. In particular, the trial court determined that Franza had not plausibly claimed that Vaglio ever relied on the appearance of an agency relationship. Id. at 1332-33.[3] Following the holding in Barbetta, the district court had no occasion to address whether Franza had sufficiently alleged the fact of negligence, and did not consider whether Franza had plausibly pled the requisite indicia of control that might have justified imputing liability to Royal Caribbean for its employees' wrongful acts. Franza timely appealed.

II.

---

[3] Though the district court gave Franza leave to amend her allegations of apparent agency, Franza elected not to do so.

We review <u>de novo</u> the district court's dismissal for failure to state a claim under Rule 12(b)(6), examining Franza's allegations in the light most favorable to the plaintiff.  <u>Hill v. White</u>, 321 F.3d 1334, 1335 (11th Cir. 2003) (per curiam).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).  This standard is met "where the facts alleged enable 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  <u>Simpson v. Sanderson Farms, Inc.</u>, 744 F.3d 702, 708 (11th Cir. 2014) (quoting <u>Iqbal</u>, 556 U.S. at 678, 129 S. Ct. at 1949).  Put differently, "[i]t is sufficient if the complaint succeeds in 'identifying facts that are suggestive enough to render [each required element] plausible.'"  <u>Rivell v. Private Health Care Sys., Inc.</u>, 520 F.3d 1308, 1310 (11th Cir. 2008) (per curiam) (quoting <u>Watts v. Fla. Int'l Univ.</u>, 495 F.3d 1289, 1296 (11th Cir. 2007)).

## III.

On appeal, Franza first challenges the dismissal of her actual agency claim.  Neither the Supreme Court nor this Court has ever decided, in binding precedent, whether a passenger may hold a shipowner vicariously liable for the medical negligence of the ship's employees.  In <u>De Zon v. American President Lines, Ltd.</u>,

9

the Supreme Court held that a "shipowner was liable in damages for harm suffered as the result of any negligence on the part of the ship's doctor." 318 U.S. 660, 669, 63 S. Ct. 814, 819 (1943). However, the De Zon Court cabined this holding to apply only where a ship's doctor breached a shipowner's special duty to a seaman -- not a passenger -- under the Jones Act. See id. at 668 (declining to consider question of liability "in the absence of the Jones Act").[4] Separately, pursuant to repealed Eleventh Circuit Rule 36-1, this Court once affirmed without opinion a dismissal order resembling the order at issue here. See Nanz v. Costa Cruises, Inc., 932 F.2d 977 (11th Cir. 1991) (Table). We are not bound, however, by a table disposition. See, e.g., U.S. Steel, LLC, v. Tieco, Inc., 261 F.3d 1275, 1280 n.3 (11th Cir. 2001) ("An affirmance pursuant to Rule 36-1 has no precedential value.").

## A.

We begin with these basic principles. Federal admiralty jurisdiction flows from the Constitution itself, see U.S. Const. art. III, § 2 ("The judicial Power shall extend . . . to all Cases of admiralty and maritime Jurisdiction . . . ."), and "[w]ith admiralty jurisdiction comes the application of substantive admiralty law." E.

---

[4] Although De Zon's holding clearly applies only to cases involving injuries to seamen, arising under the Jones Act, Royal Caribbean suggests the Supreme Court implicitly approved the principles elaborated in Barbetta, since the Court observed that the rule barring suits by passengers had been developed by "judges of great learning, for courts of last resort of states having much to do with maritime pursuits." De Zon v. Am. Pres. Lines, 318 U.S. 660, 666 n.2, 63 S. Ct. 814, 818 (1943). This dicta in no way expressed any view about the wisdom or efficacy of the Barbetta rule.

River S.S. Corp. v. Transamerica Delaval Inc., 476 U.S. 858, 864, 106 S. Ct. 2295, 2298-99 (1986).  "Absent a relevant statute, the general maritime law, as developed by the judiciary, applies."  Id. at 2299.  Indeed, the Supreme Court has repeatedly explained in maritime suits that the "Judiciary has traditionally taken the lead in formulating flexible and fair remedies in the law maritime, and 'Congress ha[s] largely left to [the Supreme] Court the responsibility for fashioning the controlling rules of admiralty law."  United States v. Reliable Transfer Co., 421 U.S. 397, 409, 95 S. Ct. 1708, 1715 (1975) (quoting Fitzgerald v. U.S. Lines Co., 374 U.S. 16, 20, 83 S. Ct. 1646, 1650 (1963)); see Moragne v. States Marine Lines, Inc., 398 U.S. 375, 405 n.17, 90 S. Ct. 1772, 1790 (1970) (noting that courts are not barred from announcing maritime rules simply because Congress has "not legislat[ed] on [the] subject"); Romero v. Int'l Terminal Operating Co., 358 U.S. 354, 361, 79 S. Ct. 468, 474 (1959) (explaining that courts are best equipped "to draw on the substantive law 'inherent in the admiralty and maritime jurisdiction'" (quoting Crowell v. Benson, 285 U.S. 22, 55, 52 S. Ct. 285, 294 (1932))); see also 1 Benedict on Admiralty, Ch. VII, § 110 (2014) (stating that Congress's maritime authority "is impliedly inherent in or derived from the grant of the judicial power").

The Supreme Court has likewise authorized and directed the lower federal courts to shape this law, explaining that the Constitution "empowered the federal

11

courts," including "the Tribunals inferior to the Supreme Court," to "develop[ ]" the general maritime law.  Romero, 358 U.S. at 360-61, 79 S. Ct. at 474 (internal quotation marks omitted); see, e.g., Transamerica, 476 U.S. at 865, 106 S. Ct. at 2299 (endorsing maritime theory of products liability first adopted by several circuits); see also Exxon Shipping Co. v. Baker, 554 U.S. 471, 508 n.21, 128 S. Ct. 2605, 2630 (2008) (observing that "modern-day maritime cases . . . support judicial action to modify a common law landscape largely of [the courts'] own making"); Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 259, 99 S. Ct. 2753, 2756 (1979) ("Admiralty law is judge-made law to a great extent . . . .").  In short, we enjoy considerable latitude in maritime cases because, under the constitutional grant, the "[b]oundaries" of maritime law generally "were to be determined in the exercise of the judicial power."  The Thomas Barlum, 293 U.S. 21, 43, 55 S. Ct. 31, 38 (1934).

Congress has not imposed vicarious liability where, as here, a passenger seeks recovery from a shipowner for the medical negligence of the ship's employees.[5]  Nor has Congress barred the application of vicarious liability in this

---

[5] In 1882, Congress passed legislation requiring certain passenger ships to carry medical personnel and to furnish "surgical instruments, medical comforts, and medicines proper and necessary for diseases and accidents incident to sea-voyages, and for the proper medical treatment of such passengers during the voyage."  Pub. L. No. 47-374, § 5, 22 Stat. 188 (1882) (codified at 46 U.S.C. § 155 (1982)).  "[T]he services of such surgeon or medical practitioner [were required to] be promptly given, in any case of sickness or disease, to any of the passengers . . . who . . . need[ed] his services."  Id.  The "master of the vessel" was liable for any

context.[6]  Thus, in addressing Franza's claims, we are obliged to exercise our

broad discretion in admiralty and maritime to develop this law, just as the Fifth

Circuit did in Barbetta.

Under the general maritime law, a shipowner traditionally has owed no duty

to practice medicine or to carry a physician on board.  See De Zon, 318 U.S. at

668, 63 S. Ct. at 819 (acknowledging that "there may be no duty to the seaman to

carry a physician").[7]  Therefore, the shipowner is only liable to its passengers for

medical negligence if its conduct breaches the carrier's more general duty to

---

violation of this statute.  Id.  However, Congress repealed this act in 1983, see Pub. L. No. 98-89, § 4(b), 97 Stat. 600 (1983), without ever enacting substitute legislation.

[6] In a few areas of maritime law, Congress has specifically limited the application of agency principles.  See, e.g., 33 U.S.C. § 905(b) (2012) (forbidding third-party suits against shipowners under Longshore and Harbor Workers' Compensation Act where injured person was "employed by the vessel to provide stevedoring services" and "the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel"); Hurst v. Triad Shipping Co., 554 F.2d 1237 (3d Cir. 1977) (tracing Congress's policy rationale for § 905(b) exception); 46 U.S.C. § 30505(b) (2012) (capping certain maritime liability where shipowner lacks "privity or knowledge"); Paradise Divers, Inc. v. Upmal, 402 F.3d 1087, 1089-90 (11th Cir. 2005) (per curiam) (explaining Congress's policy rationale for § 30505 limitation).  As we have observed, however, no such legislation protects a maritime principal from all vicarious liability in a case like this one.

[7] Franza suggests, however, that new laws now require cruise ships to carry medical personnel.  She points specifically to one statute, 46 U.S.C. § 3507 (2012), which mandates that cruise ships provide "medical staff" who possess either a "current physician's or registered nurse's license" to render "medical treatment" to victims of sexual assault.  Id. § 3507(d).  We do not read this codification as creating a broad based obligation that ships carry medical personnel onboard in order to meet the general health needs of their passengers.  Franza also argues that many cruise ships are flagged in the Bahamas, where cruise ships must carry a "duly qualified medical practitioner."  See Bahamian Merchant Shipping Act § 124.  But Franza's complaint alleges that Royal Caribbean is a Liberian corporation, Compl. ¶ 5, and does not specify where the "Explorer of the Seas" is flagged.  Nor, finally, is it otherwise clear what impact a Bahamian statute would have on a cruise ship's obligations arising under the general maritime law of the United States.

13

exercise "reasonable care under the circumstances." Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 632, 79 S. Ct. 406, 410 (1959). Franza does not argue that Royal Caribbean violated this duty directly. Rather, she asks us to hold Royal Caribbean vicariously liable under the doctrine of respondeat superior, precisely because the ship's medical employees allegedly failed to treat her father with appropriate care.

Though we have never examined whether the principles of vicarious liability apply to a passenger's claim for onboard medical negligence, the federal courts have been especially active in the general area of maritime torts. See Exxon, 554 U.S. at 508 n.21, 128 S. Ct. at 2630 (highlighting "the large part [that courts] have taken in working out the governing maritime tort principles"). In maritime tort cases, the federal courts often have: (1) adopted new theories of tort liability, see, e.g., Transamerica, 476 U.S. at 865, 106 S. Ct. at 2299 ("join[ing] [several circuits] in recognizing products liability, including strict liability, as part of the general maritime law"); (2) introduced new causes of action, see, e.g., Am. Export Lines, Inc. v. Alvez, 446 U.S. 274, 284-86, 100 S. Ct. 1673, 1679-80 (1980) (recognizing claim for loss of consortium under general maritime law), and Moragne, 398 U.S. 375, 90 S. Ct. 1772 (recognizing cause of action for wrongful death under general maritime law); and (3) promulgated new remedial rules, see, e.g., McDermott, Inc. v. AmClyde, 511 U.S. 202, 114 S. Ct. 1461 (1994) (adopting proportionate-fault

14

rule for calculation of nonsettling maritime tort defendants' compensatory liability).

Moreover, across well over a century of maritime tort precedent, the Supreme Court has required maritime principals to answer for the negligence of their onboard agents.  See, e.g., The Kensington, 183 U.S. 263, 268, 22 S. Ct. 102, 104 (1902) (characterizing as "unjust and unreasonable" any attempt by carriers to contract around "responsibility for the negligence of . . . their servants"); The J.P. Donaldson, 167 U.S. 599, 603, 17 S. Ct. 951, 953 (1897) (holding shipowner "responsible for injuries caused to third persons by [the] negligence" of ship's captain).  These teachings now permeate the general maritime law.  See, e.g., Langfitt v. Fed. Marine Terminals, Inc., 647 F.3d 1116, 1121 (11th Cir. 2011) ("[A]n otherwise non-faulty employer [is] vicariously liable for the negligent acts of its employee acting within the scope of employment."); Archer v. Trans/American Servs., Ltd., 834 F.2d 1570, 1573 (11th Cir. 1988) ("Federal maritime law embraces the principles of agency.").

That maritime law has long incorporated the concept of respondeat superior should come as no surprise.  Shipowners, like other principals, exercise real control over their agents.  See, e.g., Barrios v. La. Const. Materials Co., 465 F.2d 1157, 1164 (5th Cir. 1972) (detailing maritime principal's "control over the operations

15

which resulted in the injury to [plaintiff]").[8]  In maritime cases, as elsewhere, we therefore think it "manifestly just" to hold principals responsible for the conduct they command from their employees.  Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 437, 104 S. Ct. 774, 786 (1984); see Restatement (Second) of Agency § 219 cmt. a ("[F]rom [the acknowledgment of a principal's right of control], the idea of responsibility for the harm done by the servant's activities follow[s] naturally.").

Thus, we have regularly permitted passengers to invoke respondeat superior in maritime negligence suits.[9]  In Suzuki of Orange Park, Inc. v. Shubert, for example, a passenger in a watercraft was struck by another recreational vessel on a slalom course.  86 F.3d 1060, 1061-62 (11th Cir. 1996).  In addressing the question of liability, we observed that the corporate owner of the watercraft could be "vicariously liable under principles of respondeat superior" if the passenger's injury were negligently inflicted by a driver "acting on [the owner's] behalf."  Id. at 1066 & n.5 (emphasis omitted).  In Gibboney v. Wright, two minor passengers

---

[8] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981.

[9] Additionally, our admiralty precedent is rife with cases holding principals vicariously liable under respondeat superior for injuries negligently inflicted by agents to agents.  See, e.g., In re Dearborn Marine Serv., Inc., 499 F.2d 263, 284-86 (5th Cir. 1974); Barrios, 465 F.2d at 1164; Tri-State Oil Tool Indus., Inc. v. Delta Marine Drilling Co., 410 F.2d 178, 187 (5th Cir. 1969).  Because liability is sometimes complicated by statutory concerns in this related context, however, we separately collect these cases only to demonstrate the broad salience of respondeat superior in our admiralty precedent.

16

aboard a borrowed racing sloop were injured in a flash fire caused by an improperly secured fuel tank.  517 F.2d 1054, 1055-56 (5th Cir. 1975).  There, the former Fifth Circuit discerned "ample basis under familiar maritime principles to impute [the] negligence [of both the vessel's manufacturer and a marine surveyor] to [the shipowner,] so far as liability [for injury to the passengers] [was] concerned."  Id. at 1059.  And in Ramjak v. Austro-American S.S. Co., the former Fifth Circuit found a shipowner vicariously liable where a seaman -- "in a spirit of ostentation and bravado" -- negligently climbed the ship's mast and fell onto a passenger.  186 F. 417, 418 (5th Cir. 1911); see also Doe v. Celebrity Cruises, Inc., 394 F.3d 891, 908, 913 (11th Cir. 2004) (citing Restatement (Second) of Agency and holding cruise line strictly liable for crew member assaults on passengers).  Quite simply, our precedent has long allowed passengers to invoke the doctrine of respondeat superior in a diverse medley of maritime tort disputes.

We do not stand alone in this.  Our sister circuits, too, have generally applied agency principles to impute liability in maritime tort cases.  See Matheny v. Tenn. Valley Auth., 557 F.3d 311, 315 (6th Cir. 2009) (accepting concession that tugboat owner was liable for third-party death caused by tugboat captain's negligence); CEH, Inc. v. F/V Seafarer, 70 F.3d 694, 705 (1st Cir. 1995) (holding shipowner "vicarious[ly] liabl[e]" where captain was shipowner's "agent" who sabotaged third-party lobstering operation); McDonough v. Royal Caribbean Cruises, Ltd., 48

17

F.3d 256, 258 (7th Cir. 1995) (holding cruise line vicariously liable where steward pushed dolly over passenger's foot); Jackson Marine Corp. v. Blue Fox, 845 F.2d 1307, 1310 (5th Cir. 1988) (applying "general agency principles" to impute captain's fraud on third-party to shipowner); De Los Santos v. Scindia Steam Navigation Co. Ltd., 598 F.2d 480, 489 (9th Cir. 1979) (explaining that shipowner could incur liability under respondeat superior if crewmembers knew of allegedly defective condition that injured plaintiff); Pritchett v. Kimberling Cove, Inc., 568 F.2d 570, 579 (8th Cir. 1977) (holding boat owner "vicariously" liable where owner's "agent" negligently entrusted boat to minor who injured passengers in second boat); Ira S. Bushey & Sons, Inc. v. United States, 398 F.2d 167, 171-72 (2d Cir. 1968) (holding United States vicariously liable to third-party dry-dock owner after Coast Guardsman negligently caused dry-dock to sink); see also Landstar Express Am., Inc. v. Fed. Mar. Comm'n, 569 F.3d 493, 498 (D.C. Cir. 2009) (using "common law agency principles" to interpret Shipping Act of 1984); Servis v. Hiller Sys. Inc., 54 F.3d 203, 207 (4th Cir. 1995) (interpreting Suits in Admiralty Act in light of "basic principles of agency law" and Restatement (Second) of Agency); Peter v. Hess Oil Virgin Islands Corp., 903 F.2d 935, 940 (3d Cir. 1990) (construing Longshore and Harbor Workers' Compensation Act to incorporate "borrowed servant doctrine"); Bartlett-Collins Co. v. Surinam

18

Navigation Co., 381 F.2d 546, 550 (10th Cir. 1967) (commenting in admiralty case that "existence of an agency is a question to be decided by the trier of the fact").

Thus, even absent any statutory mandate, the Supreme Court and all of the federal circuits have for many years generally applied agency rules across a rich array of maritime cases.  Against this dynamic backdrop, Franza makes only a modest request.  We can see nothing inherent in onboard medical negligence, when committed by full-time employees acting within the course and scope of their employment, that justifies suspending the accepted principles of agency.  Certainly, nothing in our case law creates -- or even suggests -- a bright-line zone of immunity for the onboard negligence of a cruise ship's medical employees.

We acknowledge, however, that other circuits have long barred vicarious liability in this particular context.  See Barbetta, 848 F.2d at 1372 ("[G]eneral maritime law does not impose liability under the doctrine of respondeat superior upon a carrier or ship owner for the negligence of a ship's doctor who treats the ship's passengers."); accord The Great Northern, 251 F. 826, 832 (9th Cir. 1918); The Korea Maru, 254 F. 397, 399 (9th Cir. 1918); cf. Cummiskey v. Chandris, S.A., 895 F.2d 107, 108 (2d Cir. 1990) (per curiam) (citing Barbetta and "declin[ing] the invitation to break with maritime precedent" "on the facts before [the court]").[10]  In effect, these cases stand for the sweeping proposition that no

---

[10] Several district courts within this Circuit have extended this principle to protect carriers from

19

conceivable set of facts could <u>ever</u> justify holding a shipowner vicariously liable when a passenger receives negligent medical care aboard its ship.  We remain unpersuaded.

Instead, we think it more accurate to say that, absent any statutory mandate to the contrary, the existence of an agency relationship is a question of fact under the general maritime law.  See <u>Naviera Neptuno S.A. v. All Int'l Freight Forwarders, Inc.</u>, 709 F.2d 663, 665 (11th Cir. 1983) ("[T]he existence of an agency relationship is a question of fact."); <u>accord</u> <u>Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.</u>, 697 F.3d 59, 71 (2d Cir. 2012) (same); <u>Hawkspere Shipping Co., Ltd. v. Intamex, S.A.</u>, 330 F.3d 225, 236 (4th Cir. 2003) (observing that existence of agency relationship presents "triable issue of fact"); <u>Chan v. Soc'y Expeditions, Inc.</u>, 39 F.3d 1398, 1406 (9th Cir. 1994) (noting that existence of agency relationship "is a question of fact"); <u>Equilease Corp. v. M/V Sampson</u>, 756 F.2d 357, 363 (5th Cir. 1985) ("The existence of <u>any</u> agency relationship is a question of fact . . . ." (emphasis added)); <u>Bartlett-Collins</u>, 381 F.2d at 550 ("[T]he existence of an agency is a question to be decided by the trier of the fact.").  Thus, as we see it, at the pleading stage, a passenger must allege "sufficient facts to render it facially plausible that . . . an agency relationship [is] . . . present."  <u>Bamert</u>

---

liability for the actions of ships' nurses, as well as their doctors.  <u>See, e.g.</u>, <u>Hajtman v. NCL (Bahamas) Ltd.</u>, 526 F. Supp. 2d 1324, 1327-28 (S.D. Fla. 2007); <u>Jackson v. Carnival Cruise Lines, Inc.</u>, 203 F. Supp. 2d 1367, 1374-76 (S.D. Fla. 2002); <u>Stires v. Carnival Corp.</u>, 243 F. Supp. 2d 1313, 1318 (M.D. Fla. 2002).

v. Pulte Home Corp., 445 F. App'x 256, 265 (11th Cir. 2011) (citing Davila v. Delta Air Lines, Inc., 326 F.3d 1183, 1185 (11th Cir. 2003)).  In cases of medical malpractice, as in other maritime respondeat superior cases, the essential element of the relationship is the principal's control over its agents.

Plainly, under the ordinary rules of agency, the allegations in Franza's complaint support a finding that Nurse Garcia and Dr. Gonzales were agents of Royal Caribbean.  According to our unambiguous precedent, an agency relationship requires: "(1) the principal to acknowledge that the agent will act for it; (2) the agent to manifest an acceptance of the undertaking; and (3) control by the principal over the actions of the agent."  Whetstone Candy Co. v. Kraft Foods, Inc., 351 F.3d 1067, 1077 (11th Cir. 2003).  Franza adequately alleged each of these elements.

For starters, Franza's complaint plausibly established: (1) that Royal Caribbean "acknowledged" that Nurse Garcia and Dr. Gonzales would act on its behalf, and (2) that each  "accepted" the undertaking.  Most importantly, Franza specifically asserted that both medical professionals were "employed by" Royal Caribbean, were "its employees or agents," and were "at all times material acting within the scope and course of [their] employment."  Compl. ¶¶ 6, 7, 20.  Furthermore, the cruise line directly paid the ship's nurse and doctor for their work in the ship's medical center.  Id. ¶ 28.  Third, the medical facility was created,

21

owned, and operated by Royal Caribbean, id., whose own marketing materials described the infirmary in proprietary language, see id. ("[T]he doctor and nurse both worked at what [Royal Caribbean] describes in its advertising as its medical centers[.]" (emphasis added and internal quotation marks omitted)).  Fourth, the cruise line knowingly provided, and its medical personnel knowingly wore, uniforms bearing Royal Caribbean's name and logo.  Id. ¶ 29.  And, finally, Royal Caribbean allegedly represented to immigration authorities and passengers that Nurse Garcia and Dr. Gonzales were "members of the ship's crew," id. ¶¶ 31, 33, and even introduced the doctor "as one of the ship's Officers," id. ¶ 30.  Taken as true, these allegations are more than enough to satisfy the first two elements of actual agency liability.

Moreover, the facts alleged in Franza's complaint plausibly demonstrate that Royal Caribbean exercised "control" over the ship's medical personnel.  See Whetstone, 351 F.3d at 1077.  As we have explained, control is the fulcrum of respondeat superior.  We have recognized the following considerations as "probative" of control in the maritime context: "(1) direct evidence of the principal's right to or actual exercise of control; (2) the method of payment for an agent's services, whether by time or by the job; (3) whether or not the equipment necessary to perform the work is furnished by the principal; and (4) whether the principal had the right to fire the agent."  Langfitt, 647 F.3d at 1121.  Franza's

complaint plausibly supports a finding of control under at least three of these four factors.

To begin with, Franza alleged substantial "direct evidence" of Royal Caribbean's "right to control" Nurse Garcia and Dr. Gonzales.  Id.  The onboard medical personnel were: (1) "employed by" Royal Caribbean, Compl. ¶¶ 6, 7; (2) hired to work in a facility that the cruise line "owned and operated," id. ¶ 28; (3) paid directly by the cruise line, id.; (4) considered to be members of the ship's "crew," id. ¶ 31, 33; and (5) "required" to wear uniforms furnished by Royal Caribbean, id. ¶ 29.  Additionally, the cruise line "put the ship's physician and nurse under the command of the ship's superior officers."  Id. ¶ 32 (emphasis added).  At the pleading stage, these allegations offer considerable "direct evidence" of the cruise line's "right to control" its medical staff.

Franza's specific assertions about the ship's "method of payment" bolster her claim that Royal Caribbean controlled its onboard medical personnel.  See Langfitt, 647 F.3d at 1121.  Franza alleged that Royal Caribbean paid "salaries" to the ship's medical staff.  Compl. ¶ 28.  This compensation structure normally suggests an agency relationship, since payment is "by time" and not "by the job." Langfitt, 648 F.3d at 1121; see Restatement (Second) of Agency § 220 cmt. h (observing that "payment by hour or month" indicates "the relation of master and servant").  Additionally, onboard passengers are allegedly "billed directly by

[Royal Caribbean] through the passengers' Sign and Sail Card." Compl. ¶ 28. Thus, the cruise line exercises complete control over any funds that might otherwise have flowed directly from the passengers to the medical professionals in consideration of treatment rendered.

Finally, Royal Caribbean allegedly "pays to stock the 'medical centers' with all supplies, various medicines and equipment," id. ¶ 28, which lends further support to a finding of control by the cruise line. See Langfitt, 648 F.3d at 1121 (finding agency more likely where "the equipment necessary to perform the work is furnished by the principal"). Franza did not specifically allege whether Royal Caribbean had the "right to fire" its onboard medical personnel, and thus her complaint does not directly address the fourth factor indicating control under Langfitt. Nevertheless, as we have seen, Franza did assert that Nurse Garcia and Dr. Gonzales were "member[s] of the crew," Compl. ¶ 31, 33, who were "under the command of the ship's superior officers," id. ¶ 32. Presumably, the company maintains the authority to fire crewmembers. See Robert D. Peltz, Has Time Passed Barbetta by?, 24 U.S.F. Mar. L.J. 1, 31 (2012) (noting that "[t]ypical employment agreements give the cruise line the right to terminate the shipboard doctor's employment") [hereinafter Peltz, Has Time Passed Barbetta by?].

Royal Caribbean urges us to look beyond the complaint, to Vaglio's passenger ticket contract, which the cruise line attached to its motion to dismiss

24

and which purports to limit the ship's liability for onboard medical services. According to Royal Caribbean, the contract makes clear that onboard medical personnel are independent contractors, not employees or agents. At this early stage in the proceedings, however, we decline to consider the passenger ticket contract for three reasons. First, Franza did not attach the ticket contract to the complaint. Second, the complaint makes no mention of the contract. See Bickley v. Caremark Rx, Inc., 461 F.3d 1325, 1329 n.7 (11th Cir. 2006) (permitting court to consider defendant's exhibits only if "the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim" (internal quotation marks and citation omitted)); Hoffman-Pugh v. Ramsey, 312 F.3d 1222, 1225 (11th Cir. 2002) (same); see also Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1284 (11th Cir. 2007) (considering materials beyond complaint and its exhibits where plaintiff referred to document in complaint, document was central to claim, contents were undisputed, and defendant attached document to motion to dismiss). Finally, even if we were to look to the contract at this stage, we would not consider the nurse and doctor to be independent contractors simply because that is what the cruise line calls them. See, e.g., Cantor v. Cochran, 184 So. 2d 173, 174 (Fla. 1966) ("While the obvious purpose to be accomplished by this document was to evince an independent contractor status, such status depends

25

not on the statements of the parties but upon all the circumstances of their dealings with each other.").[11]

On balance, then, Franza's complaint unambiguously establishes an agency relationship between the employer, Royal Caribbean Cruises, Ltd., and its full-time employees, Nurse Garcia and Dr. Gonzales. Nothing in the complaint suggests that these medical professionals somehow acted outside the scope and course of their employment or that the requisite control was missing. Thus, applying the standard principles of agency, we are compelled to hold that Franza's complaint sets out a plausible basis for imputing to Royal Caribbean the allegedly negligent conduct of its onboard medical employees.

## B.

We decline to adopt the rule explicated in Barbetta, because we can no longer discern a sound basis in law for ignoring the facts alleged in individual medical malpractice complaints and wholly discarding the same rules of agency that we have applied so often in other maritime tort cases.[12] No decision of the

---

[11] Additionally, we note that the ticket contract arguably is internally inconsistent: at one point the contract actually discusses medical personnel and independent contractors in the alternative, see Mot. to Dismiss Ex. A, Franza v. Royal Caribbean Cruises, Ltd., 13-20090-CIV (S.D. Fla. Feb. 4, 2013), at 2 ("To the extent Passengers retain the services of medical personnel or Independent contractors . . . ." (emphasis added)), seemingly suggesting that medical personnel are not independent contractors.

[12] Several courts have already rejected or cast doubt upon the majority rule enunciated by the Fifth Circuit in Barbetta. See, e.g., Huntley v. Carnival Corp., 307 F. Supp. 2d 1372, 1374-75 (S.D. Fla. 2004) (declining to apply majority rule); Nietes v. Am. President Lines, Ltd., 188 F.

Supreme Court or this Court binds us to the strictures of Barbetta, and though we do not lightly deviate from a rule applied widely and for many years by other federal courts, we are now reluctant to endorse the approach taken by the Fifth, Ninth, and Second Circuits.  As Justice Holmes famously put it, we should not follow a rule of law simply because "it was laid down in the time of Henry IV," particularly where "the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past."  Oliver Wendell Holmes, The Path of the Law, 10 Harv. L. Rev. 457, 469 (1897).[13]

When we exercise our broad admiralty jurisdiction, "our experience and new conditions [sometimes] give rise to new conceptions of maritime concerns."  The Thomas Barlum, 293 U.S. at 52, 55 S. Ct. at 41-42.  Here, the roots of the Barbetta rule snake back into a wholly different world.  Instead of nineteenth-century

---

Supp. 219, 220-21 (N.D. Cal. 1959) (same); Mack v. Royal Caribbean Cruises, Ltd., 838 N.E. 2d 80, 91(Ill. App. Ct. 2005) (same); see also Lobegeiger v. Celebrity Cruises, Inc., 11-21620-CIV, 2011 WL 3703329 at *9 n.8 (S.D. Fla. Aug. 23, 2011) (noting weakness in majority rule); Fairley v. Royal Cruise Line, Ltd., 1993 A.M.C. 1633 (S.D. Fla. 1993) (same); Carnival Corp. v. Carlisle, 953 So. 2d 461, 469-70 (Fla. 2007) (same).

[13] Royal Caribbean argues that we must follow Barbetta in order to preserve the uniformity of maritime law.  See Appellee's Br. at 20-24.  Uniformity is a powerful and motivating concern in federal admiralty jurisdiction.  See, e.g., So. Pac. Co. v. Jensen, 244 U.S. 205, 216, 37 S. Ct. 524, 529 (1917), superceded by statute, 69 Pub. L. 803, 44 Stat. 1424 (1927), codified as amended at 33 U.S.C. § 901 et seq., (highlighting "the proper harmony and uniformity of" maritime law).  However, the federal admiralty interest in uniformity is not a stare decisis command.  Moreover, the Supreme Court introduced the principles of uniformity and harmony specifically to prevent undue encroachment upon national maritime law by the several states.  See, e.g., Romero, 358 U.S. at 373, 79 S. Ct. at 480 ("[S]tate law must yield to the needs of a uniform federal maritime law when this Court finds inroads on a harmonious system."); see also Mink v. Genmar Indus., Inc., 29 F.3d 1543, 1548 (11th Cir. 1994) (characterizing "federal [maritime] interest in uniformity" as "a reverse-Erie doctrine").

steamships, see, e.g., Barbetta, 848 F.2d at 1369 (citing O'Brien v. Cunard S.S. Co., 28 N.E. 266, 267 (Mass. 1891)), we now confront state-of-the-art cruise ships that house thousands of people and operate as floating cities, complete with well-stocked modern infirmaries and urgent care centers.  In place of truly independent doctors and nurses, we must now acknowledge that medical professionals routinely work for corporate masters.  And whereas ships historically went "off the grid" when they set sail, modern technology enables distant ships to communicate instantaneously with the mainland in meaningful ways.  In short, despite its prominence, the Barbetta rule now seems to prevail more by the strength of inertia than by the strength of its reasoning.  See United States v. Reliable Transfer Co., 421 U.S. 397, 410, 95 S. Ct. 1708, 1715 (1975).  In our view, "[t]he reasons that originally led" other courts to adopt "the rule have long since disappeared."  See id.  The rule rests on three basic arguments that a shipowner cannot exercise meaningful control over its medical staff.  But as we see it, none withstands close scrutiny.  We address each in turn.

## 1.

The first pillar is the claim that any doctor-patient (or nurse-patient) relationship, whether on land or at sea, precludes vicarious liability by its very "nature."  Barbetta, 848 F.2d at 1369.  Historically, courts have offered two separate arguments to explain why no third-party principal could ever

28

meaningfully control the conduct of a medical professional and, therefore, no liability could be vicariously imposed.  Nowadays, however, the great majority of American common law courts have disavowed this categorical liability exception and each of the rationales that once compelled it.

a.

Traditionally, courts insulated medical professionals from vicarious liability simply because of the professionals' special skills and independent judgment. Essentially, these courts reasoned that, as a policy matter, highly trained medical practitioners would and should freely use their own best judgment.  Thus, the courts decided as a matter of law that employers could not exercise control over doctors to the extent necessary to establish an agency relationship.  See, e.g., Parsons v. Yolande Coal & Coke Co., 91 So. 493, 495 (Ala. 1921) (barring vicarious liability because doctor "renders services requiring such training, skill, and experience, the exercise of which must be in accordance with his best judgment and without interference"); Schloendorff v. Soc'y of N.Y. Hosp., 105 N.E. 92, 94 (N.Y. 1914) (Cardozo, J.) (precluding vicarious liability because medicine was "an independent calling . . . sanctioned by a solemn oath"); Pearl v. W. End St. Ry. Co., 57 N.E. 339, 339 (Mass. 1900) (Holmes, C.J.) (finding "no more distinct calling than that of the doctor, and none in which the employ[ee] is more distinctly free from the control or direction of his employer"); see also Eads

29

v. Borman, 277 P.3d 503, 511 (Or. 2012) (en banc) (noting historical view that medical professionals, "because of the skill and judgment they exercised," were not subject to employer's "control").

Contemporary common law courts, however, have overwhelmingly abandoned this approach. As a fundamental matter, "[t]he rules for determining the liability of the employer for the conduct of both superior servants and the humblest employees are the same," Restatement (Second) of Agency § 220 cmt. a, and employers routinely answer for the misconduct of their skilled employees, see, e.g., Bing v. Thunig, 143 N.E.2d 3, 6 (N.Y. 1957) (objecting that "the special skill of other employees (such as airplane pilots, locomotive engineers, chemists, to mention but a few) has never been the basis for denying the application of respondeat superior"). Informed by this general rule, the courts have come to recognize that no principled distinction separates medical skill from other categories of expertise or requires universal immunization from oversight. As one court observed, "consistent application of the proposition [barring vicarious liability for medical negligence based on the degree of skill involved] . . . would require that virtually every professional who is expected to exercise independent judgment . . . would have to be deemed an independent contractor." McDonald v. Hampton Training Sch. for Nurses, 486 S.E.2d 299, 303 (Va. 1997). Such wholesale immunity has never been the rule.

30

Moreover, as the medical profession has developed, many courts have come to acknowledge that "an obligation to maintain control of their medical judgment does not . . . prevent a physician or nurse from becoming a[n] . . . employee." Arango v. Reyka, 507 So. 2d 1211, 1214 (Fla. Dist Ct. App. 1987). Unlike "physicians of the past," who often functioned as "distinct independent entities and independent centers of occupation and profession," today's medical practitioners routinely work for major conglomerates, corporations, and other large associations. Villazon v. Prudential Health Care Plan, Inc., 843 So. 2d 842, 854 (Fla. 2003). As the Florida Supreme Court has remarked, "[t]he thought of visiting a private and independent office of a totally independent physician may now be one more of history and cultural conditioning than current reality." Id.

The fact is that modern healthcare professionals often participate in diverse agency relationships. They are employed, for example, by hospitals, universities, clinics, other practitioners, and corporations of all kinds. Such principals may powerfully influence the medical judgment and conduct of their employees in many different ways. They might, for instance, restrict the practice of medicine "through hiring criteria, training, formal practice guidelines, hierarchical supervision structures, peer review groups[,] and disciplinary measures." Harris v. Miller, 438 S.E.2d 731, 737 (N.C. 1994) (footnote omitted). Even subtler constraints may be enough to establish agency relationships in certain cases. See,

31

e.g., Hodges v. Doctors Hosp., 234 S.E.2d 116, 118 (Ga. Ct. App. 1977) (finding jury question on issue of agency because hospital required staff physician to perform rotations in emergency room and paid him $100 per day); Newton Cnty. Hosp. v. Nickolson, 207 S.E.2d 659, 661-63 (Ga. Ct. App. 1974) (finding jury question on issue of agency because hospital paid physician on hourly basis and set physician's work schedule).

Amidst these broad networks of control, it should come as no surprise that the courts overwhelmingly recognize and apply the principles of vicarious liability in the world of modern medicine.  See, e.g., Univ. of Ala. Health Servs. Found., P.C. v. Bush ex rel. Bush, 638 So. 2d 794, 799 (Ala. 1994) (recognizing vicarious liability for medical negligence under Alabama law); Villazon, 843 So. 2d at 854-55 (same under Florida law); Allrid v. Emory Univ., 285 S.E.2d 521, 525-26 (Ga. 1982) (same under Georgia law); see also Eads, 277 P.3d at 511-12 ("[M]ost jurisdictions now hold that an entity that employs a physician is subject to vicarious liability for that physician-employee's malpractice if the negligent act was committed in the course and scope of the employment.").

This does not mean, of course, that every medical practitioner is someone else's agent.  The application of the doctrine is plainly fact-specific, and no bright-line rule could fit every circumstance.  Again, control of the agent by the principal remains the touchstone of the analysis.  Thus, the courts have considered agency

relationships on a case by case basis, and a wide variety of employers have faced vicarious liability for the medical negligence of their employees.  See, e.g., Univ. of Ala. Health Servs., 638 So. 2d at 801-02 (university foundation); Villazon, 843 So. 2d at 854 (health maintenance organization); Allrid, 285 S.E.2d at 525-26 (hospital); see also TransCare Md., Inc. v. Murray, 64 A.3d 887, 889 (Md. 2013) (ambulance transport company); Cox v. M.A. Primary & Urgent Care Clinic, 313 S.W.3d 240, 254 (Tenn. 2010) (urgent care clinic); Rannard v. Lockheed Aircraft Corp., 157 P.2d 1, 6 (Cal. 1945) (en banc) (aerospace corporation); Jones v. Tri-State Telephone & Telegraph Co., 136 N.W. 741, 741-42 (Minn. 1912) (telephone company); Mrachek v. Sunshine Biscuit, Inc., 283 A.D. 105, 107-08 (N.Y. App. Div. 1953) (corporate bakery).  As a matter of law, we are hard-pressed to see why the principal-agent relationship between a shipowner and a medical professional should be treated any differently -- particularly where the shipowner employs a large medical staff, wholly outfits the clinics where its medical employees work, and exercises sufficient control over those personnel.

b.

Separately, we are told that shipowners cannot control onboard medical personnel because the doctor-patient (or nurse-patient) relationship is "under the control of the passengers themselves."  Barbetta, 848 F.2d at 1369 (quoting

33

O'Brien, 28 N.E. at 267).  The Supreme Judicial Court of Massachusetts put it this way, in a nineteenth-century opinion cited heavily in Barbetta:

> [The passengers] may employ the ship's surgeon, or some other physician or surgeon who happens to be on board, or they may treat themselves if they are sick, or may go without treatment if they prefer; and, if they employ the surgeon, they may determine how far they will submit themselves to his directions, and what of his medicines they will take and what reject, and whether they will submit to a surgical operation or take the risk of going without it. The master or owners of the ship cannot interfere in the treatment of the medical officer when he attends a passenger. He is not their servant, engaged in their business, and subject to their control as to his mode of treatment.

O'Brien, 28 N.E. at 267; accord The Great Northern, 251 F. at 831-32.  Under this rule, the passenger -- as patient -- always calls the shots.

There are a number of problems with this load-bearing Barbetta principle. Most basically, we remain unimpressed by the assumption that a patient always controls his medical relationships as a matter of law.  Again, the facts are critical. It makes little sense, for example, to suggest that an unconscious trauma patient meaningfully chooses the emergency treatment he receives.  What's more, for some time, the courts have imputed vicarious liability where employers have required their employees or prospective employees to submit to a company doctor's care.  See, e.g., Lockheed Aircraft Corp., 157 P.2d at 6; Tri-State Telephone, 136 N.W. at 741; Beadling v. Sirotta, 176 A.2d 546, 549-50 (N.J. Super. Ct. Law Div. 1961); Mrachek, 283 A.D. 105 at 107-08.  In such cases,

34

vicarious liability attaches in part because the treated person "ha[s] no [medical] choice." Id. at 108.

More to the point, we are particularly skeptical of the view that the patient always holds the critical reins in this particular context. With no land on the horizon, a passenger who falls ill aboard a cruise ship has precious little choice but to submit to onboard care. The hard reality is that, at least in the short term, he may have literally nowhere else to go. See, e.g., Fairley v. Royal Cruise Line Ltd., 1993 A.M.C. 1633, 1638 (S.D. Fla. 1993) (characterizing injured or sick passengers as "captive audience" whose "only resort" is onboard medical staff); Carlisle v. Carnival Corp., 864 So. 2d 1, 5 (Fla. Dist. Ct. App. 2003) (rejecting "the unrealistic suggestion that an ailing cruise passenger at sea has some meaningful opportunity to simply forego treatment by the ship's doctor"), decision quashed 953 So. 2d 461, 469-70 (Fla. 2007) ("find[ing] merit" in intermediate appellate court's holding but applying Barbetta rule because "federal principles of harmony and uniformity" constrain state courts in maritime cases). Moreover, even where resources exist to evacuate passengers to land-based medical facilities, afflicted persons may reasonably be reluctant to seek treatment from an unknown doctor or medical facility in a foreign land. Franza's complaint only underscores these problems, to the extent she claims that Vaglio "was required to go to the ship's medical center to be seen for his injuries." Compl. ¶ 35 (emphasis added).

35

In any case, even if we were to assume that a patient always controls the treatment he receives, we would not be required to conclude that a patient exclusively controls the doctor-patient relationship.  As we have recognized elsewhere, "courts have found that a [physician's employer] may be vicariously liable for the negligent acts of physicians even where the [employer] does not control the manner and method of the physician's work."  Johns v. Jarrard, 927 F.2d 551, 556 (11th Cir. 1991) (applying Georgia law) (emphasis added).  Modern courts widely acknowledge that a principal "both can, and in fact do[es], significantly control the overall delivery of medical services . . . even if the [principal] does not direct a professional's discrete actions in treating individual patients."  Eads, 277 P.3d at 511.  Notwithstanding a patient's right to opt in or out of treatment, an employer can influence a doctor's (or nurse's) practice of medicine in countless other ways.  See, e.g., Harris, 438 S.E.2d at 737 (hiring criteria, training, practice guidelines, supervision, peer review, and disciplinary measures); see also Hodges, 234 S.E.2d at 118 (scheduling and compensation); Newton Cnty. Hosp., 207 S.E.2d at 661-63 (same).

Again, these mechanisms of control will not always yield a finding of agency.  But agency is a question of fact, and we see no sound reason for refusing to apply its principles in this context.  The long and the short of it is that, outside the maritime realm, the doctor-patient relationship no longer ineluctably, and as a

36

matter of law, bars application of respondeat superior. One by one, American common law courts have responded to seismic shifts in the medical industry by holding principals responsible for the medical negligence of their agents. Given the "wholesale abandonment of the rule in most of the area where it once held sway," Moragne, 398 U.S. at 388, 90 S. Ct. at 1781, we are reluctant to cling to these arguments under the general maritime law.

2.

The second pillar on which Barbetta rests is the claim that the scope and nature of a cruise line's expertise renders it unable to supervise a medical professional. As many courts have observed, with a note of finality, "[a] ship is not a floating hospital." Barbetta, 848 F.2d at 1369 (quoting Amdur v. Zim Israel Navigation Co., 310 F. Supp. 1033, 1042 (S.D.N.Y. 1969)). In other words, since a shipowner is "not in the business of providing medical services to passengers," we are told that no cruise line could "possess the expertise requisite to supervise" -- and, by extension, to control -- the ship's medical personnel. Id. (internal quotation marks omitted). Even if some entities might be vicariously liable for medical negligence, the argument goes, a cruise line is no such entity as a matter of law.

Again, we are unpersuaded by the breadth of this immunity-yielding rule of law. In the first place, it seems to us disingenuous for large cruise lines to disclaim

37

any medical expertise when they routinely provide access to extensive medical

care in the infirmaries they have constructed for this very purpose.  Viewing

Franza's complaint in a light most favorable to the plaintiff, Royal Caribbean is

sufficiently involved in the business of providing medical care to yield the

possibility of liability.  Thus, for example, the cruise line allegedly owns and

operates onboard medical centers, Compl. ¶ 28, which are staffed by doctors and

nurses whom the cruise line has hired, trained, outfitted, paid, and controlled, id. ¶¶

6, 7.  Moreover, if we credit Franza's claim that Royal Caribbean "pays to stock

the 'medical centers' with all supplies, various medicines and equipment," id. ¶ 28,

we also presume the cruise line knows at least something about its purchases.

Taken at face value, these allegations evince at least some institutional knowledge

of medicine.  In fact, courts recognize the medical knowledge of hospitals on

largely the same basis.  See Bing, 143 N.E.2d at 11 (concluding that hospitals

directly "undertake to treat the patient" because they "employ on a salary basis a

large staff of physicians, nurses and internes" and "charge patients for medical care

and treatment"); accord Harris, 438 S.E.2d at 736-37; Eads, 277 P.3d at 511. [14]

---

[14] What's more, we suspect that Franza's allegations only scratch the surface.  We have no
difficulty imagining other cases in which additional evidence could demonstrate a cruise line's
medical expertise -- particularly since, in the public domain, cruise lines routinely claim to
possess such knowledge.  See, e.g., Peltz, Has Time Passed Barbetta by?, at 19 (quoting
statement by Director of Princess Cruise Lines Medical Department claiming that "major cruise
lines have designed modern medical facilities comprising several ICUs, computerized radiology,
and sophisticated laboratories" and "have achieved accreditation to international health care
standards and ISO 9001 certification"); id. at 14-16 (noting that sixteen major cruise lines

There can be no dispute, however, that a cruise ship is different from a hospital. Undeniably, the practice of medicine is far more central to hospital operations than to the business of cruising. But under basic agency principles, the scope of an employer's vicarious liability is not limited to negligence arising from its primary business. Instead, common law courts regularly have imputed liability for actions taken "in the scope of [the agent's] authority or employment," Meyer v. Holley, 537 U.S. 280, 285, 123 S. Ct. 824, 829 (2003), without further requiring that any such conduct implicate the principal's core business. Therefore, when a person is "employed" to perform medical services, Compl. ¶¶ 6, 7, and where any negligence occurs "within the scope and course of [that] employment," id., vicarious liability is sometimes appropriate -- even if the employer is not a primarily medical enterprise. See, e.g., Lockheed Aircraft Corp., 157 P.2d 1

---

cooperated with American College of Emergency Physicians to develop and adopt "industry-wide guidelines" addressing "unique needs and limitations of shipboard medical infirmaries"); Adam Goldstein, Medical Tranquility and Peace of Mind, Royal Caribbean (Sept. 27, 2010), http://www.royalcaribbean.com/connect/medical-tranquility-and-peace-of-mind (touting cruise line's onboard lab equipment, x-ray units, and clot-busting thrombolytics); Press Release, Princess Cruises, Princess Cruises' Medical Departments Earn Unique Distinction with Prestigious Quality Certification and Accreditation (May 6, 2010), http://www.princess.com/news/press_releases/ 2010/05/Princess-Cruises'-Medical-Departments-Earn-Unique-Distinction-with-Prestigious-Quality-Certification-and-Accreditation.html ("[O]ur medical centers achieve similar quality standards to medical facilities ashore[.]"); Royal Caribbean Cruises Ltd., 2012 Stewardship Report, 17 (2012), http://media.royalcaribbean.com/content/en_US/pdf/13034530_RCL_2012StwrdshpTwoPgrs_v4.pdf (noting that shipowners supply equipment and provide training to enable onboard blood transfusions). We do not credit as fact any information not pled in the complaint, but we note that another plaintiff could have cited any of this information to rebut the basic assumption that cruise ships are not in the business of providing medical services.

(aerospace corporation); <u>Chi. Rock Island & Pac. Ry. Co. v. Britt</u>, 74 S.W.2d 398, 403 (Ark. 1934) (railroad); <u>Tri-State Telephone</u>, 136 N.W. 741 (telephone company); <u>Mrachek</u>, 283 A.D. 105 (corporate bakery); <u>Ebert v. Emerson Elec. Mfg. Co.</u>, 264 S.W. 453, 458 (Mo. Ct. App. 1924) (manufacturing plant); <u>see also</u> <u>Gen. Elec. Co. v. Rees</u>, 217 F.2d 595, 599 (9th Cir. 1954) (suggesting that malpractice of employee-doctor "might have bound" General Electric); <u>Hawksby v. DePietro</u>, 754 A.2d 1168, 1171-2 (N.J. 2000) (explaining that newspaper company might have been liable for employee-doctor's negligence absent workers' compensation scheme).  Against this authority, <u>Barbetta</u> stands for the proposition that cruise lines peculiarly lack all medical expertise -- so much so that a shipowner, unlike every other class of employer that employs medical staff, can never be held vicariously liable for medical malpractice as a matter of law.

In particular, where the provision of some medical services is incidental to the principal's core business, courts have not hesitated to entertain the possibility of vicarious liability.  <u>See, e.g.</u>, <u>Blackburn v. Blue Mountain Women's Clinic</u>, 286 Mont. 60, 79-80 (Mont. 1997) (reversing district court's dismissal of family planning clinic in suit concerning counselor's negligence); <u>Speed v. Iowa</u>, 240 N.W. 2d 901 (Iowa 1976) (affirming judgment against state for medical malpractice occurring at University of Iowa's Student Health Infirmary); <u>cf.</u> <u>Kleinknecht v. Gettysburg College</u>, 989 F.2d 1360, 1374-75 (3d Cir. 1993)

40

(suggesting college might be vicariously liable for negligence of athletic program trainers during medical emergency); Santiago v. Archer, 136 A.D. 2d 290, 292 (N.Y. App. Div. 1988) (reversing district court's grant of summary judgment because union might be vicariously liable for medical malpractice occurring at its clinic).

One example that strikes us as particularly salient is case law addressing whether universities should be exempt from medical malpractice when they choose to open medical clinics that serve their student bodies and members of the community. University clinics are in many ways similar to cruise ship medical centers. Both types of facilities provide an abbreviated menu of treatment and procedure options as compared to a hospital or private physician's office. Emory Univ. v. Porubiansky, 282 S.E. 2d 903, 903, 904 (Ga. 1981) (noting that clinic patients agree to treatment that "proceed[s] more slowly" and may not be able to "insist on complete treatment"); Ash v. N.Y. Univ. Dental Ctr, 164 A.D. 2d 366, 369 (N.Y. App. Div. 1990) (noting that a clinic might "limit[] itself to certain types of care or refus[e] to perform certain procedures"). Moreover, neither a cruise line nor a university is in the primary business of providing medical services. Finally, each entity claims to have constructed and maintained its facilities, not for the purpose of entering the medical service business, but as a supplement to its primary business. For the universities, clinics provide basic services to students

41

and community members and serve as educational and research tools for their students and professors.  See Tunkl v. Regents of the Univ. of Cali., 383 P.2d 441, 442 (Cal. 1963); Emory Univ., 282 S.E. at 905.  And for the cruise lines, medical centers allegedly are provided as a convenience to passengers who may become ill at sea.

In the university clinical program context, courts have declined to create sweeping immunity from medical malpractice liability, explaining that these characteristics of clinics do not justify "an exemption from the duty to exercise reasonable care."  Emory Univ., 282 S.E. 2d at 905. As the Georgia Supreme Court has observed, clinics, and thus the universities that run them, "engage in the practice of [medicine]" by "offering services."  Id.  This fact, rather than the university's core business or underlying purposes for deciding to provide medical care, is of primary importance when determining whether an exemption from liability is appropriate.  See id.  ("The status of Emory University School of Dentistry as primarily a training institution does not allow for an exemption from the duty to exercise reasonable care.").  Additionally, in reponse to a university's argument that it should be immune from vicarious, though not direct, negligence, the California Supreme Court has noted that no feature of clinical programs justified such a departure from general principles of agency.  The court observed that "a legion of decisions . . . have drawn no distinction between the corporation's

42

own liability and vicarious liability resulting from the negligence of agents," Tunkl v. Regents of the Univ. of Cali., 383 P.2d 441, 448 (Cal. 1963), and that no rationale supported adopting a different rule in the case of university clinics.  In our view, blanket immunity from vicarious liability is similarly unwarranted when cruise ships choose to create, stock, and operate onboard medical centers with their own physicians and nurses.  Taking Franza's allegations at face value, Royal Caribbean employed medical personnel who rendered negligent services in the course and scope of their medical employment, onboard a ship outfitted by the principal with a medical infirmary or urgent care center.  This seems to us to be sufficient medical knowledge to at least withstand a motion to dismiss for failure to state a claim.

Moreover, no principle from maritime tort law justifies treating shipowners so differently from ordinary employers.  On the contrary, shipowners have been held vicariously liable for misconduct that falls at least this far outside the heartland of the cruising business.  In Muratore v. M/S Scotia Prince, for example, a shipowner's subcontractor's photographer-employees tortiously photographed and harassed a passenger.  845 F.2d 347, 349-50 (1st Cir. 1988).  The First Circuit affirmed the shipowner's vicarious liability because the tortfeasors were "part of [the ship's] crew," even though the shipowner was not primarily in the business of photography.  Id. at 353.  If shipowners could be held liable for the photography of

43

a subcontractor's employee, we see little reason to suppose they could not be called to answer for the medical negligence of the practitioners they directly employ and control.  Cf. Rogers v. Allis-Chalmers Mfg. Co., 92 N.E.2d 677, 683 (Ohio 1950) (acknowledging possibility that machinery manufacturer could be vicariously liable for negligence by employees "engaged in athletic activities," though manufacturer was "not in the business of athletics"); Strait v. Hale Constr. Co., 26 Cal. App. 3d 941, 950 (Cal. Dist. Ct. App. 1972) (affirming farmer's vicarious liability for highway collision caused by on-loan employee-operator of farmer's loaned machine, though farmer was avowedly "not in the business of renting heavy equipment and furnishing an operator").

There are also important policy reasons that inform against broad immunity for cruise lines against any liability for their medical staff's malpractice.  Carriers owe their ailing passengers "a duty to exercise reasonable care to furnish such aid and assistance as ordinarily prudent persons would render under similar circumstances."  Barbetta, 848 F.2d at 1371 (internal quotation marks omitted).  By investing in medical infrastructure and hiring skilled medical employees, cruise ships avoid the potentially high cost of providing reasonable care in more expensive ways.  See, e.g., The Iroquois, 194 U.S. 240, 243 (1904) (explaining that reasonable care depends on, inter alia, "the proximity of an intermediate port").  The shipowner, by providing onboard medical resources, will often "avoid[ ] [its]

44

sometimes inconvenient and costly duty to change course for the benefit of an ailing passenger." Nietes, 188 F. Supp. at 221. Under the Barbetta rule, shipowners have access to a liability free method of discharging their duty of care to passengers that is outside the realm of meaningful judicial review. Additionally, beyond any potential for cost avoidance, cruise lines may even profit affirmatively from onboard medical care. For instance, they might charge passengers for treatment rendered. See Compl. ¶ 28. And, surely, for at least some ticket-buying customers, the availability of onboard medical facilities is a deal-maker.[15] In short, cruise lines have chosen quite deliberately to enter the business of medicine, often in a large way, and they reap the tangible benefits of this business strategy. Thus, it seems hardly anomalous to require cruise lines to bear the burden of this choice. See generally Gregory C. Keating, The Idea of Fairness in the Law of Enterprise Liability, 95 Mich. L. Rev. 1266, 1269 (1997).[16]

---

[15] Indeed, in one study, persons over sixty represented nearly thirty percent of all respondents who had ever taken a cruise vacation. Taylor Nelson Sofres, 2011 Cruise Market Profile Study, Cruise Lines Int'l Assoc., 32 (June 2011), http://www.cruising.org/sites/default/files/pressroom/ Market_Profile_2011.pdf. Considering the likely preferences of this key demographic, we think it very unlikely that cruise lines will respond to their new liability by eliminating onboard medical care.

[16] Several other policy arguments suggest setting aside the Barbetta rule. First, as compared with an employee-doctor, a resource-rich cruise line can more readily bear the cost of a plaintiff's injury. See generally Prosser & Keeton, The Law of Torts 500-01 (5th ed. 1984) (noting that employer is better able to "absorb," "distribute," and "shift" losses caused by employee torts) [hereinafter Prosser & Keeton, The Law of Torts]; Guido Calabresi, Some Thoughts on Risk Distribution and the Law of Torts, 70 Yale L.J. 499, 527 (1961) (describing "deep pocket" justification for imposing liability on principals).Second, by imposing vicarious liability for employee torts, we encourage profit-seeking employers to minimize the risk of costly tortious

All told, <u>Barbetta</u>'s assumption that cruise lines lack any medical expertise is difficult to accept in light of the industry's decision to construct, outfit, and staff medical centers onboard its ships. Moreover, no feature peculiar to cruise lines distinguishes them from other corporate principals which must ordinarily answer for the medical negligence of their employees. Again, we are loath to adopt a principle of law that always immunizes a shipowner without regard to any of the facts.

3.

The final pillar on which <u>Barbetta</u> rests is the notion that shipowners never exercise "sufficiently immediate" control over their onboard medical personnel to warrant vicarious liability. <u>Barbetta</u>, 848 F.2d at 1371 (quoting <u>Amdur</u>, 310 F. Supp. at 1042). At its core, this argument assumes that no shipowner may ever be close enough to control its onboard medical staff, whether the ship is geographically near or distant from the principal's home base. The glaring problem we see with this conclusion is its fact-dependent premise. Put simply, shipowners and their vessels (and their onboard medical staff) are not always far apart. Thus, for example, whenever onboard treatment occurs before a ship

---

conduct. <u>See generally</u> Richard A. Posner, <u>A Theory of Negligence</u>, 1 J. Legal Stud. 29, 43 (1973) (describing respondeat superior as mechanism encouraging employers to "invest until the last cent of [their] investment . . . saves one cent in . . . costs"); Prosser & Keeton, <u>The Law of Torts</u>, at 500 (identifying "modern justification for vicarious liability" as "deliberate allocation of risk" (footnote omitted)).

46

departs, the owner of the vessel may be very close at hand. Moreover, a ship that has already set sail may still be near its harbor of origin, or a ship may hug the coastline and remain close to land-based medical facilities. And some ships may even be owned by physical persons, whose supervision would certainly be "immediate" whenever they traveled onboard. In short, principals and onboard agents may be physically close together. To the extent that physical separation vitiates control, the relevant questions are fact-based and ill-suited to resolution by a per se rule of law.

Furthermore, as a general rule, the mere fact of physical separation between principals and agents does not inevitably defeat respondeat superior -- in medical malpractice cases or elsewhere. Again, the facts are everything. See, e.g., Scott v. SSM Healthcare St. Louis, 70 S.W.3d 560, 568 (Mo. Ct. App. 2002) ("reject[ing] the notion that [an agency] relationship cannot be found merely because the hospital does not have the right to stand over the doctor's shoulder"); see also TransCare Md., 64 A.3d at 889-90, 903 (suggesting that ambulance company could be vicariously liable for employee-paramedic's negligence aboard helicopter); Sigmon v. Tompkins Cnty., 449 N.Y.S. 2d 621, 623 (N.Y. Sup. Ct. 1982) (suggesting that ambulance company could be vicariously liable for medical malpractice rendered by employee nurse traveling in ambulance); Restatement (Second) of Agency § 220 cmt. d ("[T]he control or right to control needed to

47

establish the relation of master and servant may be <u>very attenuated</u>." (emphasis added)); cf. <u>Grigsby v. Coastal Marine Serv. of Tex., Inc.</u>, 412 F.2d 1011, 1031 (5th Cir. 1969) (implying unseaworthiness liability of "remote owner" where "conduct . . . somehow implicates" that owner).

Even if distance may undercut liability in some cases, we see no need to adopt a one size fits all rule where advanced technology often enables effective communication between shore based principals and onboard medics. We do not have to hypothesize about scenarios to support this point, because cruise lines proudly advertise their own capabilities. Several cruise lines now purport to staff extensive land-based medical departments with expert personnel. <u>See</u> Peltz, <u>Has Time Passed Barbetta by?</u>, at 20 & n.69 (citing examples). By many accounts, these and other onshore practitioners meaningfully communicate with a ship's medical employees even while the ship is at sea. <u>See, e.g.</u>, <u>id.</u> at 21-22 (detailing onboard treatment of passenger's acute-onset stroke "[w]ith clinical and logistical assistance" of shore-based medical team). These communications occur through channels that were unheard of when the Fifth Circuit decided <u>Barbetta</u>, long before the advent of widespread cellular and satellite communications. <u>See, e.g.</u>, Royal Caribbean Cruises Ltd., <u>2010 Stewardship Report</u>, 8 (2010), www.royalcaribbeanpresscenter.com/download-press-release/891/ (highlighting modern cruise line's "teledermatology" partnership with shore based university);

Holland America Line, Onboard Medical Services and Facilities, 1 (2005),

http://www.hollandamerica.com/assets/news/PR_Medical.pdf (explaining that

"[t]he ship is able to access any medical specialist at [University of Texas Medical

Branch]  in Galveston" and "radiologists can provide an instant overread of any x-

rays done on board).  Because, twenty-six years after Barbetta, we now think a

shipowner could plausibly supervise a ship's medical employees in places near and

far, we reject the sweep of the rule's final rationale.

In short, we do not find that the arguments set forth in Barbetta justify its

broad grant of immunity from vicarious liability in all claims of medical

malpractice.  Rather, we think we are obliged to follow our own maritime

precedent, which demands fact-intensive treatment of agency questions.  We

cannot accept a legal principle that would erect a categorical exception from this

settled practice, and we see no reason to follow an outdated rule that serves no

useful purpose in modern maritime law.  Thus, we hold that Franza's allegations

established a plausible agency relationship between the employer, Royal Caribbean

Cruise Lines, Ltd., and its employees, Nurse Garcia and Dr. Gonzales, and that the

district court improvidently granted the Rule 12(b)(6) motion to dismiss.

IV.

Franza also appeals the dismissal of her claim brought under the alternative theory of apparent agency.[17]  We are the first circuit to address whether a passenger may use apparent agency principles to hold a cruise line vicariously liable for the onboard medical negligence of its employees.  Like the district court, we conclude that a passenger may sue a shipowner for medical negligence if he can properly plead and prove detrimental, justifiable reliance on the apparent agency of a ship's medical staff-member.  However, we part ways with the district court's conclusion that Franza's apparent agency claim was pled inadequately.  As we see it, Franza has plausibly alleged all of the elements of apparent agency.

## A.

Plainly, actual agency and apparent agency are distinct theories of liability.  Unlike actual agency, the doctrine of apparent agency allows a plaintiff to sue a principal for the misconduct of an independent contractor who only reasonably appeared to be an agent of the principal.  See, e.g., Borg-Warner Leasing, 733 F.2d

---

[17] Many courts use the terms apparent agency, apparent authority, ostensible agency, and agency by estoppel interchangeably.  Though some courts have distinguished apparent agency and apparent authority as theories of liability that require no reliance, we have never recognized that distinction.  See, e.g., Borg-Warner Leasing v. Doyle Elec. Co., 733 F.2d 833, 836 (11th Cir. 1984) (requiring "detrimental reliance" to establish "apparent authority" under Florida law); Arceneaux v. Texaco, Inc., 623 F.2d 924, 926-27 (5th Cir. 1980) (requiring "reliance" to establish "apparent authority in tort cases" under Louisiana law); Crowe v. Hertz Corp., 382 F.2d 681, 688 (5th Cir. 1967) (equating "apparent agency" with "agency by estoppel" and requiring "reliance" under Georgia law).  In any case, even if we were to acknowledge the possibility of "apparent agency" liability without reliance, Franza's complaint did not allege vicarious liability on any such theory.  Accordingly, we intend the term "apparent agency" in the ordinary sense.

at 836 (Florida law); Crowe, 382 F.2d at 688 (Georgia law); see also Restatement (Second) of Agency § 267.

These separate doctrines have been applied for quite different reasons and under very different circumstances. While respondeat superior derives from a principal's right to control the conduct of its agents, liability under apparent agency flows from equitable concerns. See Brown ex rel. Brown v. St. Vincent's Hosp., 899 So. 2d 227, 236 (Ala. 2004) (equating apparent agency with agency by estoppel under Alabama law); Jackson Hewitt, Inc. v. Kaman, 100 So. 3d 19, 31 (Fla. Dist. Ct. App. 2011) ("[L]iability based on apparent authority is a form of estoppel."); Capital Color Printing, Inc. v. Ahern, 661 S.E.2d 578, 585 (Ga. Ct. App. 2008) (noting that "doctrine of apparent agency is predicated on principles of estoppel" (internal quotation marks and alteration omitted)); accord Primeaux v. United States, 181 F.3d 876, 879 (8th Cir. 1999) ("[O]stensible agency is no agency at all; it is in reality based entirely on an estoppel." (internal quotation marks and citation omitted)); Drexel v. Union Prescription Ctrs., Inc., 582 F.2d 781, 791 (3d Cir. 1978) (equating apparent agency and agency by estoppel under Pennsylvania law); Sennott v. Rodman & Renshaw, 474 F.2d 32, 38 (7th Cir. 1973) (same under Illinois law); Hill v. St. Clare's Hosp., 490 N.E.2d 823, 827 (N.Y. 1986) (same under New York law); see also Baptist Mem'l Hosp. Sys. v. Sampson, 969 S.W.2d 945, 947 (Tex. 1998) (noting doctrine's equitable

51

foundation); <u>Morback v. Young</u>, 113 P. 22, 24 (Or. 1911) (same); <u>Donnelly v. S.F.</u>

<u>Bridge Co.</u>, 49 P. 559, 560 (Cal. 1897) (same).  Essentially, then, liability may be

appropriate under apparent agency principles when a principal's conduct could

equitably prevent it from denying the existence of an agency relationship.

Because apparent agency does not turn on any notion of control, the <u>Barbetta</u>

rule does not directly address the question of apparent agency.[18]  Apprehending

this distinction, many district courts within this Circuit have already recognized a

shipowner's apparent agency liability for onboard medical negligence.  <u>See, e.g.</u>,

<u>Aronson v. Celebrity Cruises, Inc.</u>, __ F. Supp. 2d ___, No. 12-CV-20129, 2014

WL 3408582, at *12 (S.D. Fla. May 9, 2014); <u>Lobegeiger v. Celebrity Cruises,</u>

<u>Inc.</u>, 869 F. Supp. 2d 1356, 1361 (S.D. Fla. 2012); <u>Peavy v. Carnival Corp.</u>, No.

1:12-CV-20782, 2012 WL 5306353, at *2 (S.D. Fla. Oct. 26, 2012); <u>Gentry v.</u>

<u>Carnival Corp.</u>, No. 11-21580-CIV, 2011 WL 4737062, at *4-5 (S.D. Fla. Oct. 5,

2011); <u>Smolnikar v. Royal Caribbean Cruises Ltd.</u>, 787 F. Supp. 2d 1308, 1324

---

[18] A few courts have suggested that, because of <u>Barbetta</u>'s prominence, no plaintiff could ever reasonably mistake the agency status of onboard medical personnel "[a]bsent an explicit manifestation by the ship owner countering the settled principle that medical staff [members] are not their agents." <u>Huang v. Carnival Corp.</u>, 909 F. Supp. 2d 1356, 1361 (S.D. Fla. 2012); <u>see also</u> <u>Hajtman</u>, 526 F. Supp. 2d at 1328-29 (holding that <u>Barbetta</u> rule precluded any reasonable belief that medical staff were agents of shipowner); <u>Warren v. Ajax Navigation Corp.</u>, 1995 A.M.C. 2609 (S.D. Fla. 1995) (same).  Whatever its merits, this argument does not survive our departure from the traditional rule.  Separately, other courts have concluded that the <u>Barbetta</u> rule bars apparent agency claims because apparent agency is merely a form of respondeat superior. <u>See, e.g.</u>, <u>Balachander v. NCL (Bahamas) Ltd.</u>, 800 F. Supp. 2d 1196, 1204 (S.D. Fla. 2011); <u>Wajnstat v. Oceania Cruises, Inc.</u>, No. 09-21850-CIV, 2011 WL 465340, at *4 (S.D. Fla. Feb. 4, 2011).  We think that view misapprehends the analytical distinction between actual and apparent agency.

(S.D. Fla. 2011); Peterson v. Celebrity Cruises, Inc., 753 F. Supp. 2d 1245, 1248 (S.D. Fla. 2010); Ridley v. NCL (Bahamas) Ltd., 824 F. Supp. 2d 1355, 1362 (S.D. Fla. 2010); Rinker v. Carnival Corp., No. 09-23154-CIV, 2010 WL 9530327, at *4 (S.D. Fla. June 18, 2010); Barnett v. Carnival Corp., No. 06-22521-CIV, 2007 WL 1746900, at *2 (S.D. Fla. June 15, 2007); Hajtman v. NCL (Bahamas) Ltd., 526 F. Supp. 2d 1324, 1328 (S.D. Fla. 2007); Suter v. Carnival Corp., 2007 A.M.C. 2564 (S.D. Fla. 2007); Doonan v. Carnival Corp., 404 F. Supp. 2d 1367, 1371-72 (S.D. Fla. 2005); Huntley v. Carnival Corp., 307 F. Supp. 2d 1372, 1375 (S.D. Fla. 2004); Fairley v. Royal Cruise Line Ltd., 1993 A.M.C. 1633, 1639-40 (S.D. Fla. 1993).

We agree with this view.  As we have noted at some length, the principles of agency permeate the general maritime law, see Archer, 834 F.2d at 1573, and apparent agency is no exception.  The great weight of admiralty precedent has long allowed plaintiffs to sue shipowners based on the apparent authority of third-parties.  See El Amigo v. Houston Marine Eng'g Works, 285 F. 868, 870 (5th Cir. 1923) (upholding claim against shipowner because third-party who ordered supplies, repairs, and necessities "ha[d] apparent authority to bind the vessel"); accord Garanti, 697 F.3d at 72 (reversing summary judgment in maritime contract dispute because of factual question regarding third-party's "actual or apparent authority to act on [shipowner's] behalf" (emphasis added)); Hawkspere, 330 F.3d

53

at 236 (affirming shipowner's maritime lien because no issue of fact existed "as to whether [third-party] acted as an actual <u>or apparent</u> agent for [shipowner]" (emphasis added)); <u>Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV</u>, 199 F.3d 220, 228 (5th Cir. 1999) (affirming denial of maritime lien on theory of "apparent authority" because shipowner did not "undert[ake] actions that caused [plaintiffs] reasonably to believe that [third-party] was its agent"); <u>Cactus Pipe & Supply Co. v. M/V Montmartre</u>, 756 F.2d 1103, 1111 (5th Cir. 1985) (absolving shipowner of liability for damaged cargo because third-party did not have "apparent authority" to issue bills of lading); <u>cf.</u> <u>Marine Transp. Servs. Sea-Barge Grp., Inc. v. Python High Performance Marine Corp.</u>, 16 F.3d 1133, 1138-39 (11th Cir. 1994) (recognizing doctrine of equitable estoppel in maritime context).

The federal circuits have made only passing references to apparent agency principles in maritime <u>tort</u> cases. <u>See, e.g.</u>, <u>Reino de España v. Am. Bureau of Shipping, Inc.</u>, 691 F.3d 461, 474 n.16 (2d Cir. 2012) (suggesting that maritime principal might have been liable for reckless conduct if alleged agent had possessed "apparent authority" to receive certain notifications); <u>Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.</u>, 696 F.3d 647, 659 (7th Cir. 2012) (implying that maritime principal might have been liable for negligence under doctrine of "apparent authority" if plaintiffs had established their "belie[f] that [third-party]

54

was acting as [principal's] agent").  Nonetheless, given the broad salience of agency rules in maritime law, see Archer, 834 F.2d at 1573, and the important role the federal courts play in setting the bounds of maritime torts, see Exxon, 554 U.S. at 508 n.21, 128 S. Ct. at 2630, we think apparent agency principles apply in this context.  Indeed, the equitable foundations of apparent agency are just as important in tort as in contract.  See Arceneaux, 623 F.2d at926 (assuming that Louisiana courts would apply apparent agency in tort cases because they had done so in contract); see also Drexel, 582 F.2d 791-92 (concluding under Pennsylvania law that "policies" and "factual issues" support apparent agency in both contract and tort).

Having long applied the principles of apparent agency in maritime cases, we can discern no sound basis for allowing a special exception for onboard medical negligence, particularly since we have concluded that actual agency principles ought to be applied in this setting as well.  Outside the maritime realm, many common law courts -- including the courts found in all three states of this Circuit -- have recognized vicarious liability for the medical negligence of apparent agents. See, e.g., Brown, 899 So. 2d at 238 ("see[ing] no reason" in medical malpractice case "to abandon [the Alabama Supreme Court's] rule" of apparent agency); Roessler v. Novak, 858 So. 2d 1158, 1162 (Fla. Dist. Ct. App. 2003) (holding principal "vicariously liable for the acts of physicians, even if they are independent

55

contractors, if these physicians act with . . . apparent authority"); Richmond Cnty. Hosp. Auth. v. Brown, 361 S.E.2d 164, 166-67 (Ga. 1987) (recognizing vicarious liability where principal "represented to [plaintiff] that its emergency room physicians were its employees"); see also Eads, 277 P.3d at 514 ("[T]he weight of authority in other jurisdictions is that, in a proper case, a hospital or other entity can be held vicariously liable for a physician's negligence on an apparent authority theory."). Medical negligence triggers the same equitable concerns whether it arises on land or at sea, and, therefore, we think apparent agency liability may be appropriate in both settings.

## B.

Under the doctrine of apparent agency, just as in the case of actual agency, vicarious liability turns on the facts presented. When applying the tort and contract law of several states, we have repeatedly observed that apparent agency liability requires finding three essential elements: first, a representation by the principal to the plaintiff, which, second, causes the plaintiff reasonably to believe that the alleged agent is authorized to act for the principal's benefit, and which, third, induces the plaintiff's detrimental, justifiable reliance upon the appearance of agency. See Borg-Warner Leasing, 733 F.2d at 836 (Florida law); Arceneaux, 623 F.2d at 927 & n.4 (Louisiana law); Crowe, 382 F.2d at 688 (Georgia law).

Applying these general principles to the facts alleged in this case, we conclude that Franza has plausibly and adequately pled all three elements of apparent agency.

In the first place, Royal Caribbean purportedly made a number of salient representations to Vaglio. The cruise line: (1) "promote[d] its medical staff and represent[ed] them as being [cruise line] employees through brochures, internet advertising, and on the vessel," Compl. ¶ 26; (2) publicly described the medical centers in proprietary language, id. ¶ 28; (3) billed passengers directly for onboard medical services, id. ¶ 28; (4) required its doctors and nurses to wear uniforms bearing the cruise line's name and logo, id. ¶ 29; (5) held out Dr. Gonzales and Nurse Garcia as "members of the ship's crew" to passengers and immigration authorities, id. ¶¶ 31, 33; and (6) "introduce[d]" Dr. Gonzales to the ship's passengers "as one of the ship's Officers," id. ¶ 30.

Second, based on these allegations, Vaglio reasonably could believe that Dr. Gonzales and Nurse Garcia were authorized to render medical services for the cruise line's benefit. Indeed, according to Franza's complaint, Royal Caribbean actually intended that its passengers perceive the ship's medical staff to be agents of the cruise line, insofar as the cruise line encouraged "the idea that the medical staff who work in its 'medical centers' are employed by the cruise line as part of a marketing tool to induce passengers such as [Vaglio] to buy cruises on its ships." Id. ¶ 27.

57

Finally, as for the third element, the district court dismissed Franza's apparent agency claim because her complaint "d[id] not state how Vaglio relied on, or changed his position in reliance on, his alleged belief that the doctor and/or nurse was Royal Caribbean's agent." Franza, 948 F. Supp. 2d at 1333. We disagree. It is true that "apparent agency [cannot] exist for the benefit of the person injured without reliance upon the apparent holding out of the principal." Crowe, 382 F.2d at 688. Moreover, this reliance must be "detrimental," Borg-Warner Leasing, 733 F.2d at 836, and "justifiabl[e]," Arceneaux, 623 F.2d at 927 n.4 (quoting Restatement (Second) of Agency § 267); see also Drexel, 582 F.2d at 791; Stone v. Palms W. Hosp., 941 So. 2d 514, 520 n.13 (Fla. 4th DCA 2006) (per curiam). However, the complaint alleged precisely such reliance:

> [Vaglio] relied to his detriment on his belief that the physician and nurse were direct employees or actual agents of [Royal Caribbean] in that [Vaglio] followed the advice of the nurse and/or physician who did not seek any further medical testing or evaluation while the ship was in Bermuda, that he relied on the ship's nurse and/or physician, [and] that he did not follow-up with the ship's medical staff as he was told that he did not have any serious injury.

Compl. ¶ 38.

We are hard-pressed to see how this pleading falls short. Indeed, Franza explained that Vaglio (1) "relied to his detriment" (2) "on his belief" (3) that Dr. Gonzales and Nurse Garcia "were direct employees or actual agents of [Royal Caribbean]." Furthermore, through the specifying phrase, "in that," she alleged

58

precisely how Vaglio relied on the appearance of agency: (1) he "followed the advice of the nurse and/or physician," (2) despite the fact that those medical personnel "did not seek any further medical testing or evaluation while the ship was in Bermuda," and (3) the degree of his reliance was so pronounced "that he did not [even] follow up with the ship's medical staff."  At this early stage in the proceeding, one plausible interpretation of Franza's allegations is that Vaglio indeed relied to his profound detriment on the appearance of agency, in that he would not have blindly trusted the advice of unknown medical personnel (who sought no counsel from other medical professionals while the ship was docked) if the ship's doctor and nurse had not borne the imprimatur of a well-known and trusted cruise line.  Under these circumstances, and in light of Royal Caribbean's advertised medical expertise, detrimental reliance may have been justifiable.

Of course, we recognize that Franza could have taken her allegations one step further.  Thus, she could have specifically claimed that Vaglio would not have followed the advice of the ship's medical personnel had he suspected they were not actually the agents of Royal Caribbean.  Effectively, however, that sort of statement would only put Franza's existing message in the negative.  We do not require plaintiffs to perform such linguistic gymnastics in order to defeat a motion to dismiss.  On these specific allegations, then, we are constrained to reverse the district court's dismissal of Franza's apparent agency claim.

59

V.

Having determined that Franza plausibly alleged two alternative theories of vicarious liability, we turn to a final question: whether the complaint adequately supports a claim of negligence in the first place. We think it does. To plead negligence in a maritime case, "a plaintiff must allege that (1) the defendant had a duty to protect the plaintiff from a particular injury; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury; and (4) the plaintiff suffered actual harm." Chaparro, 693 F.3d at 1336. All four elements are met here.

First, Franza alleged that Royal Caribbean was duty-bound to "provide prompt and appropriate medical care" following Vaglio's severe head injury. Compl. ¶ 19. It is indisputable that cruise lines must treat their passengers with "ordinary reasonable care under the circumstances." Keefe v. Bahama Cruise Line, Inc., 867 F.2d 1318, 1322 (11th Cir. 1989) (per curiam). Implicit in this variable standard is the notion that cruise lines will not always be held to the same standard of care that would guide treatment onshore. This is as it should be, since standards of care typically vary among differently situated healthcare providers. See, e.g., Jackson v. Pleasant Grove Health Care Ctr., 980 F.2d 692, 694 & n.2 (11th Cir. 1993) (recognizing in nursing home negligence case that, under Alabama law, relevant standard of care governs "similarly situated health care

60

provider[s]"), abrogated on other grounds by Weisgram v. Marley Co., 528 U.S. 440, 120 S. Ct. 1011 (2000); see also Cruz-Vázquez v. Mennonite Gen. Hosp., Inc., 613 F.3d 54, 56 (1st Cir. 2010) (noting that standard of care depends on "relevant medical circumstances"); Watson v. United States, 485 F.3d 1100, 1109-10 & n.7 (10th Cir. 2007) (finding no clear error in determination that ambulatory care clinic was not required under applicable standard of care to stock Mannitol, since evidence suggested that "Mannitol was not a medication normally administered outside of a hospital setting"); cf. Fla. Stat. Ann. § 766.102 (2013) (defining standard of care in medical malpractice action "in light of all relevant surrounding circumstances").  Here, the precise contours of Royal Caribbean's duty depend on questions of fact that need not and cannot be answered at this stage.  However, Franza's specific allegations suffice.

Second, Royal Caribbean, by and through its medical personnel, purportedly breached its duty in "one or more of the following ways": (1) "failing to properly assess the condition" of Vaglio; (2) "allowing a nurse to make the initial assessment"; (3) "failing to have a doctor assess [Vaglio]"; (4) "failing to timely diagnose and appropriately treat [Vaglio]"; (5) "failing to order appropriate diagnostic scans to further assess the degree of injury"; (6) "failing to obtain consultations with appropriate specialists"; (7) "failing to properly monitor [Vaglio]"; (8) "failing to evacuate [Vaglio] from the vessel for further care in a

61

timely manner"; and (9) "deviating from the standard of care for patients in Mr. Vaglio's circumstances who had suffered a significant blow to the head." Compl. ¶ 20. If proven, these allegations could establish a breach of even a modest duty of care, framed by the particular circumstances of the case.

Third, Franza has alleged that, as a "direct and proximate result of [this] negligence," Vaglio's "condition deteriorated to the point that he fell into a coma and died." Id. ¶ 22. In fact, had Vaglio "received the appropriate care and treatment," the claim is made that, "more likely than not[,] . . . he would have survived." Id. ¶ 23. Finally, Vaglio suffered damages as a result of Royal Caribbean's alleged negligence. Vaglio's estate "has become obligated to pay significant medical bills and other expenses," id. ¶ 24, and his "widow . . . has lost his pension, his social security, medical insurance, and the value of his services and incurred expenses for medical care, funeral services[,] and interment," id. ¶ 25. Taken in a light most favorable to Franza, these assertions set forth a prima facie claim of negligence.

## VI.

In sum, the allegations in Franza's complaint plausibly support holding Royal Caribbean Cruises, Ltd., vicariously liable for the medical negligence of its onboard nurse and doctor. Because Franza adequately pled all of the elements of both actual and apparent agency, we hold that Franza may press her claims under

either or both theories.  Accordingly, we reverse and remand for further

proceedings consistent with this opinion.

**REVERSED AND REMANDED.**